# EXHIBIT A





Powered by Google **Translate**

# Civil Court Case Information – Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2021-006034 | Judge: | Mikitish, Joseph |
| File Date: | 4/14/2021 | Location: | Downtown |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Patrick B Horsman | Plaintiff | Male | Daniel Fredenberg |
| Brett R Jefferson | Defendant | Male | John Wilenchik |
| Ian Lev | Defendant | Male | John Wilenchik |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 5/10/2021 | CAN - Credit Memo Appearance Fee Paid | 5/10/2021 | |
| **NOTE:** Credit Memo/Appearance Fee Paid | | | |
| 5/7/2021 | MCD - Motion To Consolidate | 5/10/2021 | |
| **NOTE:** Motion to Consolidate | | | |
| 5/4/2021 | MOT - Motion | 5/6/2021 | |
| **NOTE:** Defendants Motion for Extension of Time to File Answer or Responsive Pleading | | | |
| 4/28/2021 | AFS - Affidavit Of Service | 5/4/2021 | |
| **NOTE:** BRETT JEFFERSON | | | |
| 4/26/2021 | AFS - Affidavit Of Service | 4/30/2021 | |
| **NOTE:** BRETT JEFFERSON | | | |
| 4/14/2021 | COM - Complaint | 4/14/2021 | |
| **NOTE:** Complaint | | | |
| 4/14/2021 | CSH - Coversheet | 4/14/2021 | |
| **NOTE:** Civil Cover Sheet | | | |
| 4/14/2021 | CCN - Cert Arbitration - Not Subject | 4/14/2021 | |
| **NOTE:** Certificate Of Compulsory Arbitration - Is Not Subject To | | | |
| 4/14/2021 | SUM - Summons | 4/14/2021 | |
| **NOTE:** Summons | | | |
| 4/14/2021 | SUM - Summons | 4/14/2021 | |
| **NOTE:** Summons | | | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

# EXHIBIT B



Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/14/2021 4:04:24 PM
Filing ID 12775124

# In the Superior Court of the State of Arizona
# In and For the County of Maricopa

**Plaintiff's Attorneys:**

Daniel E. Fredenberg - Primary Attorney

Bar Number: 020158, issuing State: AZ

Law Firm: Fredenberg Beams

4747 N. 7th Street, Suite 402

Phoenix, AZ 85014

Telephone Number: (602)595-9299

Email address: dfredenberg@fblegalgroup.com


Christian C.M. Beams

Bar Number: 019672, issuing State: AZ

Law Firm: Fredenberg Beams

Telephone Number: (602)595-9299


Christopher S. Skinner

Bar Number: 032781, issuing State: AZ

Law Firm: Fredenberg Beams

Telephone Number: (602)595-9299

**CV2021-006034**

**Plaintiff:**

Patrick B. Horsman

4747 N. 7th Street, Suite 402

Phoenix, AZ 85014


**Defendants:**

Brett R Jefferson

225 Tokeneke Rd.

Darien, CT 06820


Ian Lev

21194 N. 82nd Street

Scottsdale, AZ 85255


Discovery Tier t3

AZturboCourt.gov Form Set #5615706

Case Category: Other Civil Case Categories
Case Subcategory: other

Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/14/2021 4:04:24 PM
Filing ID 12775125

Person/Attorney Filing: Daniel E. Fredenberg
Mailing Address: 4747 N. 7th Street, Suite 402
City, State, Zip Code: Phoenix, AZ 85014
Phone Number: (602)595-9299
E-Mail Address: dfredenberg@fblegalgroup.com
[ ☐ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 020158, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

Patrick B. Horsman
Plaintiff(s),
v.
Brett R Jefferson, et al.
Defendant(s).

Case No. **CV2021-006034**

**CERTIFICATE OF COMPULSORY ARBITRATION**

I certify that I am aware of the dollar limits and any other limitations set forth by the
Local Rules of Practice for the Maricopa County Superior Court, and I further certify that
this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of
the Arizona Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this

By: Daniel E. Fredenberg /s/
    **Plaintiff/Attorney for Plaintiff**

AZTurboCourt.gov Form Set #5615706

Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/14/2021 4:04:24 PM
Filing ID 12775126

Person/Attorney Filing: Daniel E. Fredenberg
Mailing Address: 4747 N. 7th Street, Suite 402
City, State, Zip Code: Phoenix, AZ 85014
Phone Number: (602)595-9299
E-Mail Address: dfredenberg@fblegalgroup.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 020158, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

Patrick B. Horsman
Plaintiff(s),

v.

Brett R Jefferson, et al.
Defendant(s).

Case No. **CV2021-006034**

**SUMMONS**

To: Brett R Jefferson

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an Answer in writing with the Court, and you must pay the required filing fee. To file your Answer, take or send the papers to Clerk of the Superior Court, 201 W. Jefferson, Phoenix, Arizona 85003 or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation. Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top of this Summons.
Note: If you do not file electronically you will not have electronic access to the documents in this case.

3. If this Summons and the other court papers were served on you within the State of Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the date of service, not counting the day of service. If this Summons and the other court papers were served on you outside the State of Arizona, your Answer must be filed within THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  MARICOPA

SIGNED AND SEALED this Date: *April 14, 2021*

*JEFF FINE*
Clerk of Superior Court

By: *SENA ALLEN*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/14/2021 4:04:24 PM
Filing ID 12775127

Person/Attorney Filing: Daniel E. Fredenberg
Mailing Address: 4747 N. 7th Street, Suite 402
City, State, Zip Code: Phoenix, AZ 85014
Phone Number: (602)595-9299
E-Mail Address: dfredenberg@fblegalgroup.com
[ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 020158, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Patrick B. Horsman<br>Plaintiff(s),<br>v.<br>Brett R Jefferson, et al.<br>Defendant(s). | Case No. **CV2021-006034**<br><br>**SUMMONS** |

To: Ian Lev

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT
AFFECTS YOUR RIGHTS. READ THIS SUMMONS CAREFULLY. IF YOU DO
NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers were
   served on you with this Summons.

2. If you do not want a judgment taken against you without your input, you must file an
   Answer in writing with the Court, and you must pay the required filing fee. To file your
   Answer, take or send the papers to Clerk of the Superior Court, 201 W. Jefferson,
   Phoenix, Arizona 85003 or electronically file your Answer through one of Arizona's
   approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
   Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top
   of this Summons.
   Note: If you do not file electronically you will not have electronic access to the documents
   in this case.

3. If this Summons and the other court papers were served on you within the State of
   Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the
   date of service, not counting the day of service. If this Summons and the other court papers
   were served on you outside the State of Arizona, your Answer must be filed within
   THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of
   service.

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  MARICOPA

SIGNED AND SEALED this Date: *April 14, 2021*

*JEFF FINE*
Clerk of Superior Court

By: *SENA ALLEN*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #5615706

2

Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/14/2021 4:04:24 PM
Filing ID 12775123

**FREDENBERG BEAMS**
Daniel E. Fredenberg – 020158
Christian C. M. Beams – 019672
Christopher S. Skinner – 032781
4747 N. 7th Street, Suite 402
Phoenix, Arizona 85014
Telephone:  602/595-9299
Email: dfredenberg@fblegalgroup.com
Email: cbeams@fblegalgroup.com
Email: cskinner@fblegalgroup.com
*Attorneys for Patrick B. Horsman*

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| PATRICK B. HORSMAN, an individual,<br><br>  Plaintiff,<br><br>v.<br><br>BRETT R. JEFFERSON, an individual, and IAN LEV, an individual,<br><br>  Defendants. | Case No.  **CV2021-006034**<br><br><br>**COMPLAINT** |

Plaintiff Patrick B. Horsman, by and through undersigned counsel, for his Complaint against Defendant Brett R. Jefferson for Civil RICO, Civil Conspiracy, Intentional Interference with Business Expectancies, Defamation, False Light Invasion of Privacy, and Intentional Infliction of Emotional Distress and against Defendant Ian Lev for Civil Conspiracy, Aiding and Abetting Civil RICO, and Intentional Interference with Business Expectancies, alleges as follows:

### **INTRODUCTION**

1.     This case is about extortion, defamation, and business disparagement, whereby Defendants threatened Plaintiff that if Plaintiff did not pay them money, Defendants would,

among other things, falsely impugn Plaintiff's integrity, accuse him of unlawful conduct, disgrace Plaintiff publicly, and contact investors, government agencies, and the media to falsely tell them that Plaintiff misled investors and engaged in other unlawful acts. When Plaintiff did not succumb to Defendants' ultimatum, Defendants followed through on their threats. This action seeks redress for Defendants' reprehensible conduct.

2.      While Defendants may be trying to hide behind legal terms, their scheme is abundantly clear for what it is: an old-fashioned shakedown.

3.      Plaintiff Horsman co-founded Integrated Ag – a private equity fund that invests in farmland in the Southwestern United States – in 2012, and the company and its affiliates have been in continuous operations since then. Starting with just a couple hundred acres, over the course of the next eight years, Horsman and his partners acquired, managed, and controlled over 16,000 acres of farmland and created, both directly and indirectly through labor contractors, over 50 jobs in the state of Arizona.

4.      Like in many markets, reputation is critical in the investment industry. The Arizona agricultural industry in particular is an especially tight-knit community of buyers, sellers, investors, farmers, and interconnected service providers, making the favor and goodwill of market participants an invaluable part of Integrated Ag's business. Integrated Ag and its principals and affiliates have long enjoyed a good reputation within the industry.

5.      Plaintiff Horsman is an entrepreneur who, in addition to co-founding Integrated Ag, has founded several other successful businesses. The majority of Horsman's career has been focused on his own investment management business and raising capital for other fund managers as a placement agent. Over the course of his nearly 20-year-long career, he has

raised over $15 billion of institutional capital for hedge funds, private equity, and real estate managers. Horsman holds the Certified Financial Analyst designation and FINRA Series 7, 24, 66, and 79 licenses. Horsman's business reputation and advantageous business relationships with investors are critical components to his work with private investment funds.

6.     On December 11, 2018, Congress passed the Agriculture Improvement Act of 2018 (the "2018 Farm Bill") that legalized the cultivation of hemp, drastically transforming hemp policy in the United States by allowing the transfer of hemp and hemp-derived products across state lines for commercial and other purposes and easing restrictions on the sale, transport, or possession of hemp-derived products. This meant that cannabidiol (CBD), a non-intoxicating compound derived from hemp, would be legal if produced in a manner consistent with the Farm Bill.

7.     At that time, CBD exploded in popularity and was touted for its potential benefits in treating pain, providing relief for anxiety and depression, and promoting sleep, among others. To capitalize on the newly found demand for CBD and the lack of reliable industrial-scale supply, Horsman and his partners saw the opportunity to use their connections and expertise in the agricultural industry to launch Integrated CBD LLC ("Integrated CBD"), a vertically integrated, institutional scale and quality supplier of organic hemp-derived CBD products and ingredients.

8.     To execute their vision, in January 2019, Horsman and his partners prepared an investor presentation that outlined the opportunity in the newly legal hemp and CBD industry and explained how their background as founders and managers of Integrated Ag and

its affiliates, as well as their connections and expertise in investing in and managing farmland in Arizona and California, were advantageous in their new venture to grow and process hemp on an industrial scale. In addition to outlining the opportunity to invest in the first-of-its-kind hemp growing and processing operation, the presentation and accompanying subscription agreement also emphasized the risks of early-stage company investing and warned investors against relying on any forward-looking statements.

9.      Over the course of the next 14 months, Integrated CBD raised in excess of $60 million from institutional and accredited individual investors, including $1.3 million from Plaintiff Horsman and his family, $2.5 million from BRJ Holdings III, LLC[1], and $50,000 from Defendant Lev. Integrated CBD used the proceeds to hire a full-time team, lease farmland, purchase hemp seeds, plant and cultivate hemp, purchase and lease farming equipment, hire multiple contractors and engineering firms to design and build a hemp drying and processing facility and a separate extraction and distillation facility.

10.     Following the legalization of hemp cultivation, hemp acreage in the U.S. more than tripled from 2018 to 2019, leading to an oversupply at harvest in the fall of 2019.[2] In November 2019, the Food & Drug Administration ("FDA"), which had assumed regulatory authority over hemp-derived products after the passing of the 2018 Farm Bill, prohibited putting CBD into food and beverages and issued numerous warning letters that certain CBD products violated the federal Food Drug & Cosmetic Act.

---

[1] Jefferson is the sole member of BRJ Holdings III, LLC, a Nevada limited liability company.
[2] Mona Zhang & Paul Demko, "Hemp was supposed to boost farmers.  It's turned out to be a flop," Politico (May 25, 2020), https://www.politico.com/news/2020/05/25/hemp-farmers-275046.

11.     While the FDA had previously issued a series of warning letters to the same effect since as early as spring 2019, neither Integrated CBD nor its investors, which included large institutions, foresaw that it would fundamentally impact Integrated CBD's ability to execute its business plan because food and beverage was one of the many potential end markets. The FDA's November 2019 announcement, however, was significantly more detrimental to the industry than the earlier letters, stating that the FDA could not conclude that CBD was generally recognized as safe (GRAS) for use in human or animal food.

12.     As a result, although farmers produced significant quantities of hemp and processors were processing it into high-quality CBD oil, large companies that had been planning to buy CBD ingredients for their consumer product launches did not follow through on those plans. This led to a severe supply-demand imbalance, causing hemp and CBD prices to plummet significantly below their cost of production. In 2020, for example, asset values in industrial hemp had diminished so much that several CBD businesses filed for Chapter 11 bankruptcy, including Kentucky's GenCanna Global, which had previously been planning an IPO.[3] As demonstrated in the following chart, the year-on-year price of CBD and hemp decreased significantly (-79%) from May 2019 to April 2020.[4]

---

[3] *Id.*; 'Precipitous' Decline in Hemp and Cannabis M&A Continuing Amid COVID-19 Pandemic, Forbes (Apr. 17, 2020), https://www.forbes.com/sites/mergermarket/2020/04/27/precipitous-decline-in-hemp-and-cannabis-ma-continuing-amid-covid-19-pandemic/?sh=3e4f32665c05.

[4] New Leaf Data Services, LLC; *see also* "America is Growing 8x the Amount of CBD Hemp it Can Consume and Prices Are Crashing," Kush.com, kush.com/blog/america-facing-hemp-cbd-surplus/ (last visited Nov. 29, 2020) (explaining the sequence that led to the hemp price crash).

Year on Year Price % Change: May 2019 to April 2020

13.     As a result of such macroeconomic conditions, Integrated CBD, like its industry peers, was unable to generate its projected revenue. The cannabis industry also generally saw a sharp decline in investment activity as a result of weak industry performance in 2019, halting investment activity in the hemp industry and further exacerbating the situation.

14.     Despite meeting (and exceeding) its fundraising benchmarks and milestones through the early fall of 2019, in early December, it became apparent that the future of Integrated CBD was in jeopardy. At that time, Horsman did all he could to support the business, and even personally injected an additional $571,000 into the company in early 2020 to support its ongoing operation. Unfortunately, as the industry continued to decline, Integrated CBD and its investors – including Horsman and his partners – ultimately lost the entirety of their investments.

15.    Rather than accept that outcome, Defendants pressured Horsman to return their entire investments, even if doing so would be at the expense of other investors. On August 10, 2020, Ryan Andrews, counsel acting on behalf of Defendants and BRJ Holdings, sent a letter to Horsman's counsel demanding that Horsman return **all** of his clients' investments, despite acknowledging that they would obtain a "much smaller judgment" in court. In the same letter, Mr. Andrews used the threat of a FINRA investigation to pressure Horsman into settling, noting that if Horsman refused to agree to their unreasonable terms, "a blacklist from fundraising will be received as a victory." Mr. Andrews also threatened that "if [his] client prevails on a breach of fiduciary duty claim against [Horsman], [Horsman] will be out of the raising capital business forever," despite the fact that BRJ Holdings, in its capacity as a lender, as opposed to an investor, could not and did not pursue such a claim.

16.    In a text message exchange the next day, on August 11, 2020, Horsman suggested to Jefferson that they attempt to resolve the matter out of court and on reasonable terms, but Jefferson was unreceptive. The following week, on August 19, 2020, Jefferson emailed Horsman and threatened to use the press to seek repayment of the entirety of his investment:

> I will [sic] contacting CNBC to sell you "Patrick the scam artist" to American Greed so they can also alert everyone.  Please note that I will also be contacting major media contacts I have to make sure that [sic] know about your antics…  Patrick Fuck You we are going to war!!

17.    Jefferson continued to demand that Horsman pay him money if Horsman did not want to be publicly disgraced. When those threats did not lead to the desired outcome, Defendants followed through on their threats to spread false information and publicly accused Horsman of unlawful conduct and disgrace. BRJ Holdings III, LLC and Lev filed a

7

groundless and frivolous action in Maricopa County Superior Court on October 2, 2020 ("The Frivolous BRJ Complaint")   Notably, Jefferson's extortionate threats and defamatory statements were made by him personally, yet he was not a party to the Frivolous BRJ Complaint. As a result, Jefferson's defamatory statements about, and extortionate threats against Horsman are not protected by the litigation privilege for defamatory statement made in litigation. True to Defendants' threats, the Frivolous BRJ Complaint  is rife  with  false, tabloid style accusations against Horsman and his business partners and businesses. And, Jefferson and Lev knew they were false when they made them. Defendants falsely accused Horsman of fraudulent conduct because they knew that doing so would destroy Horsman's reputation and ruin his career – and that is exactly what Defendants set out to accomplish when Horsman refused to succumb to their shakedown.

18.    Four days after the complaint was filed on October 2, 2020, the Miami Herald published a story about the case. The story included a link to a copy of the complaint that was *not stamped by the court*, meaning that Defendants followed through with their threat to use the press and alerted the media regarding the details of the civil action. The story also included information regarding some of Horsman's real estate holdings that were not even discussed in the publicly filed complaint.

19.    Even after the filing of the complaint, Jefferson's threats to Horsman did not cease. In January 2021, Jefferson threatened Horsman that if Horsman did not pay him and Lev the full amount of their investment, they would cause additional plaintiffs to join the lawsuit against Horsman, which would in turn increase Horsman's costs of defending against the lawsuit. Conversely, if Horsman paid Jefferson and Lev off now, then "we will disappear"

and "others will not have the commitment or staying power to continue." Jefferson's assertion that he could direct others to pursue or forgo legal action against Horsman as it suited his interests confirms that Jefferson's sole concern is getting paid off – not rectifying any alleged (and nonexistent) wrongdoing.

20.    In sum, Defendants are abusing the legal process as a tactic in their attempt to extort money from Horsman as a result of a failed investment in an industry that experienced severe turmoil over the past year.

21.    Defendants' actions have damaged Plaintiff by, among other things, forcing Plaintiff to expend hundreds of thousands of dollars to mitigate the harm caused by these malicious acts, including harm to business reputation, advantageous business relations with investors, loss of millions of dollars-worth of business profits, loss of goodwill, and emotional distress. Plaintiff has been forced to retain the undersigned counsel and required to pay their reasonable attorneys' fees and costs.

## **PARTIES**

22.    Plaintiff Patrick Horsman is a resident of San Juan, Puerto Rico. Horsman is an entrepreneur who grew up in Scottsdale, Arizona, and has founded several businesses in the area, including Integrated Ag LP and Integrated CBD. At all relevant times, Horsman was the President, CEO, and Chairman of the Board of Integrated CBD, which was headquartered and did business in Maricopa County, Arizona.

23.    Defendant Ian Lev is a resident of Maricopa County, Arizona. Lev holds himself out as a cannabis entrepreneur and is the founder and CEO of Hy Yield Scientific, a producer of agricultural fertilizer. At one point, Lev was the CEO of Hydrotek Hydroponics,

9

a distributor of hydroponic equipment for cannabis growers. In January 2019, Lev invested $50,000.00 in Integrated CBD and signed the subscription agreement acknowledging the risks associated with his investment. In Spring 2020, after Integrated CBD's unfortunate downturn, Lev embarked on a calculated scheme to try and recover his capital investment. When Horsman and Horsman's business partners rebuffed his requests, Lev recruited a serial litigant Jefferson, who Lev knew was willing to go to extraordinary – and illicit – lengths to pressure Horsman to return their investments.

24.     Defendant Brett Jefferson is a resident of Fairfield County, Connecticut. In May 2019, Jefferson, through his entity BRJ Holdings III, LLC, loaned $2.5 million to Integrated CBD in the form of a convertible note. Jefferson is the founder and President of Hildene Capital Management, a Connecticut-based asset management firm that specializes in structured finance investments, and has been involved in the finance and investment sector for over 25 years. In addition to working in the finance and investment industry, Jefferson is a serial litigant, with a decades-long history of suing his business partners and associates. In the finance industry, Jefferson has a reputation as a difficult investor who often threatens meritless litigation to get his way. In October 2020, after Horsman did not succumb to Jefferson's and Lev's threats to publicly disgrace Horsman if he did not pay them money, Jefferson and Lev acted on their threats and publicly spread false information about Horsman and initiated a pending civil action against him, among others, in the Superior Court of Arizona, Maricopa County.  Because Jefferson is not a named party in CV2020-012256, he is not entitled to the absolute litigation privilege recognized under Arizona law.

**RELEVANT NONPARTIES**

25.     Integrated CBD LLC is a Delaware limited liability company that was headquartered and did business in Scottsdale, Arizona.

26.     Integrated CBD Holdings LLC is a Delaware limited liability company that was headquartered and did business in Scottsdale, Arizona.

27.     Integrated CBD LLC and Integrated CBD Holdings LLC are referred to interchangeably throughout this complaint as "Integrated CBD." At all relevant times, Horsman was the President, CEO, and Chairman of the Board of Integrated CBD. Lev invested $50,000.00 in Integrated CBD in January 2019; in May 2019, Jefferson, through BRJ Holdings III, LLC, loaned Integrated CBD $2.5 million via a convertible note.

28.     Integrated Ag LP is a Delaware limited liability company headquartered in Scottsdale, Arizona. Integrated Ag is a private equity fund that invests in farmland in the Southwestern United States. Horsman is Integrated Ag's co-founder and managing partner.

**JURISDICTION AND VENUE**

29.     This is an action for damages that exceed $300,000.00, exclusive of attorneys' fees, costs, and interest.

30.     This Court has jurisdiction over Defendants to this action pursuant to U.S. Const. amend. XIV and Ariz. R. Civ. P. 4.2(a). Jurisdiction over Lev is proper because Lev is a resident of Maricopa County, Arizona. Jurisdiction over Jefferson is proper because he purposefully availed himself of the privilege of conducting business in the State of Arizona, such that the claims advanced, *infra*, arise out of his contact with businesses and individuals within the State of Arizona, and therefore the exercise of personal jurisdiction is reasonable.

11

*Inter alia*, Jefferson purposefully availed himself of the laws of the State of Arizona by (1) investing in Integrated CBD, ***a Maricopa County, Arizona-headquartered company***, whose performance was the subject of Jefferson's ire, resulting in the allegations contained herein; (2) committing tortious acts against Horsman resulting from Jefferson's outrage that his capital investment, loaned through BRJ Holdings III, LLC to Integrated CBD, ***a company headquartered in Maricopa County, Arizona***, was lost through unfortunate market changes; (3) personally, and not on behalf of BRJ Holdings, threatening to "expose" Horsman for Horsman's alleged illicit actions unless the entirety of his loan to Integrated CBD was returned, emanating from Horsman's actions as President and CEO of Integrated CBD, which, again, ***is headquartered in Maricopa County, Arizona***,  constituting Civil RICO under Arizona law; (4) taking the yet-filed complaint in CV2020-012256, ***eventually filed in Maricopa County, Arizona***, and leaking it to numerous media outlets, including, but not limited to, the Miami Herald; and (5) conspiring with Co-Defendant Ian Lev, ***a resident of Maricopa County, Arizona***, to engage in a pattern of unlawful extortion to try and recoup their capital investments in Integrated CBD.

31.    This Court has subject matter jurisdiction over this matter pursuant to Ariz. Const. Art. VI, §14 and A.R.S. §12-123.

32.    Venue is proper in Maricopa County, Arizona, pursuant to A.R.S. § 12-401(1) because Defendant Lev resides in Maricopa County, Arizona.

33.    This case is eligible for, and Plaintiff hereby requests, assignment of this case to the Commercial Court under Ariz. R. Civ. P. 8.1(a)(1)(B)-(C) because this action seeks

monetary relief in amount greater than $300,000.00 and the primary issues of law and fact concern a "business organization" and a "business contract or transaction."

## ALLEGATIONS
### Background

34.     Plaintiff Horsman co-founded Integrated Ag in 2012 with Jeff Dreyer, Ari Schiff, and Michael Timony. Having previously been involved in the private equity, real estate, and agricultural industries, they saw the opportunity to invest in underdeveloped farmland in Arizona and California. That land was particularly suitable for farming because, due to year-round warm temperatures, it enjoyed uninterrupted crop-growing cycles, unlike the land in the Midwest and Northeast, which remained idle during the winter months and was less productive. Integrated Ag focused on sustainable water-saving technologies, such as drip irrigation, to increase the value and marketability of the properties and generate profits for its institutional investors.

35.     Since its inception, Integrated Ag has been in continuous operation and grew from the four-person founding team and just a couple of hundred acres of leased land to over 40 employees and 16,000 acres, right before Defendants set out on their vindictive smear campaign. Over the course of its operation, Integrated Ag created over 50 jobs in the state of Arizona.

36.     On December 11, 2018, Congress passed the 2018 Farm Bill. The Bill drastically transformed hemp policy in the United States, legalizing the cultivation of hemp – also known as cannabis sativa L – and allowing transfer of hemp and hemp-derived products across state lines for commercial and other purposes. This meant that cannabidiol

13

(CBD), a non-intoxicating compound derived from hemp, would be legal if produced in a manner consistent with the Farm Bill.

37.    Around the same time, CBD exploded in popularity and was touted for its potential benefits in treating pain, providing relief for anxiety and depression, and promoting sleep, among others. Yet, there were no institutional-scale producers of CBD in the United States because, until that time, growing hemp was illegal under federal law.

38.    To capitalize on the newly legal industry and corresponding demand for CBD, Horsman and his business partners saw the opportunity to use their connections and expertise in the agricultural industry in Arizona – with its year-round growing conditions and predictable weather pattern – to found Integrated CBD, a vertically-integrated, institutional scale and quality supplier of organic hemp-derived CBD products and ingredients.

39.    In early January 2019, Horsman and his business partners began to crystalize their vision and prepared an investor presentation that outlined the opportunity – and accompanying risks – to potential investors. The presentation relied heavily on Integrated Ag's experience and connections in the farmland industry, including its leadership team and its access to over 10,000 acres of conventional and organic farmland in Arizona, to plant 2,000-3,000 acres of hemp in 2019.  At that time, Integrated CBD had not yet formally launched.

40.    The initial fundraising round was intended to raise capital to lease farmland, hire key executives and staff, including hemp cultivation experts, identify sources of high-quality seeds, and engage service providers to execute on a very fast ramp-up to planting

hemp in the spring of 2019. Once Integrated CBD launched, Integrated Ag's team of executives, farmers, and operations specialists would form the core team of Integrated CBD.

42. Absent Integrated Ag's existing team, balance sheet, credit history, farmland development experience, and farmland ownership, Integrated CBD could not have possibly established and scaled its operations at the rate that it did. The relationship between Integrated Ag and Integrated CBD – as well as Integrated CBD's reliance on Integrated Ag to support its operations – was clearly outlined in the presentation that was shared with Integrated CBD's investors, including Defendants, and was the key advantage that Integrated CBD had over its competitors.

42. In addition to outlining the opportunity to invest in the first-of-its-kind hemp growing and processing operation, the presentation and accompanying subscription documents emphasized – and all investors acknowledged – the risks of early-stage company investing, including that "the investment in the Company is speculative and involves a high degree of risk," the possibility of "the loss of Subscriber's entire investment," "decline in economic conditions," and "other general business risks, including the effects of a recession." It also warned investors against relying on any forward-looking statements.

43. The idea, experience, and background of the founding team immediately resonated with investors, and Plaintiffs raised over $3.3 million of pre-seed capital, including $50,000 from Lev, in January 2019.

**Integrated CBD Meets and Exceeds Its Milestones**

44. Immediately following the raise, Horsman aggressively pursued and exceeded many of the company's projected milestones to deliver value to its investors. In February

2019, McCarthy, a national construction company, submitted a proposal to build Integrated CBD's hemp extraction plant, intended to maximize production efficiency. In March 2019, Integrated CBD began designing the extraction facility with Jacobs Engineering, the number one industrial design firm in the United States. Around the same time, Integrated CBD sourced and ordered extraction equipment, identified a location for the hemp processing facility, began to design the drying, sorting, and packing facility, and purchased hemp seeds for planting.

45.    By April 2019, Integrated CBD entered into two farm leases for over 9,700 gross acres of farmland in Hyder Valley, Yuma County, which farmland had produced an above-average yield cotton crop the year before, in addition to being generally known for its consistent, favorable farming conditions. At all relevant times, through its relationship with Integrated Ag, which was highlighted in the investor presentations, Integrated CBD had access to: (1) over 15,000 gross acres, (2) over 14,000 farmable or tillable acres, and (3) over 10,000 farmable acres that were or could have been certified organic immediately and an additional 4,000 farmable acres that were conventional and could have been certified organic within three years.

46.    Between January and August 2019, Integrated CBD assembled an all-star team, including executives and employees who had previously worked at prominent public companies like JP Morgan, Google, Bloomberg, and Dupont, in addition to the core team of Integrated Ag's farming and development experts. The company also hired a General Counsel with previous public company experience, a Chief Revenue Officer to develop and execute a revenue strategy in 2019, a Chief Risk Officer to ensure the company was properly

managing risks across the business, and a plant scientist to head the hemp seed genetics program and develop proprietary seed genetics for planting in 2020.

47.    Integrated CBD was ready to plant its first crop in Yuma county in the late spring of 2019. It could not do so, however, until the State of Arizona passed its hemp legislation and the Arizona Department of Agriculture issued industrial hemp grower and industrial hemp processor licenses to the company. Arizona Governor Doug Ducey, with whom Integrated CBD executives met in early 2019 to discuss state hemp legislation, was a strong proponent of Arizona becoming a leading hemp producer. On February 20, 2019, Ducey signed Senate Bill 1003 allowing hemp farmers to begin planting crops, once properly licensed, in June 2019. In May 2019, Integrated CBD applied for the industrial hemp grower and processor licenses. It was among the first license recipients on June 5, 2019, and just two days later, it was the first license-holder to sow hemp seeds in Arizona on June 7, 2019, becoming "the largest hemp operation in the state," according to Brian McGrew, Industrial Hemp Program manager at the Arizona Department of Agriculture.

48.    The optimal crop planting window in Yuma County is in March, when temperatures are consistently in the 70s and 80s, which allows small plants to establish root systems prior to higher temperatures of Arizona summers. In light of the risks associated with planting later in the growing season (as a result of the legislative and licensing process) under more difficult conditions, Integrated CBD initiated multiple levels of risk management including, but not limited to, reducing the number of acres planted to minimize the impact of any crop losses, using both direct seeding and greenhouse seedlings, and installing above-

ground sprinklers to provide additional sources of water as the plant root systems were being established.

49.     Integrated CBD was able to accomplish as much as it did in such a short period of time in no small part due to its access to Integrated Ag's (and its affiliates' and team's) assets, infrastructure, credit history, balance sheet, and farmland management expertise. To launch quickly and be competitive with others in the industry, Integrated CBD leveraged its connections with Integrated Ag and its affiliates – the very connections it touted as the key to its success – to enter into arms-length, market-rate transactions for land, equipment, and services.

50.     For example, on March 15, 2019, Integrated CBD entered into a farm lease with Integrated Ag XI. Although the two entities are related by common management, Integrated Ag XI did not arbitrarily set the pricing and terms of the lease. Instead, the key lease terms mirrored the terms of another farmland lease on an adjacent property that Integrated CBD negotiated over the course of several months with an independent third party, Goldcrest Farm Trust REIT, LLC. The terms and pricing in both leases are consistent with those of the prior leases on the same property and a subsequent lease signed on the property to grow alfalfa after Integrated CBD defaulted on its lease obligations.

51.     Integrated CBD also took advantage of Integrated Ag's affiliates' existing equipment rental business to obtain below-market rates for specialized equipment. This equipment rental relationship was not unique to Integrated CBD, and Integrated Ag projects had historically relied on Integrated Ag affiliates for equipment because they could procure it at lower rates. The rates charged by affiliates for equipment were based on rates requested

from multiple third-party equipment rental companies. Certain equipment was not available for rent and had to be purchased. At that time, Integrated CBD had no revenue, balance sheet, or credit history, and therefore was unable to finance equipment purchases and did not have enough capital to buy the equipment outright. To allow Integrated CBD to obtain the necessary equipment, Integrated Ag stepped in and purchased it on its own balance sheet using its own credit history and then leased it to Integrated CBD. Integrated Ag did not make any profit on the equipment leased to Integrated CBD; in fact, Integrated Ag suffered losses on the equipment it purchased for Integrated CBD and is to this day making payments on specialized equipment it has been unable to sell.

52.    The farm management fees were likewise at or below industry averages. Farm management agreements are common in large-scale institutional farming operations. Institutional investors often hire farm managers to operate and farm their properties for them, and Integrated Ag had an existing farm management business that employed a team that provided services to several clients. Integrated CBD hired Integrated Ag's existing farm management team to manage its farming operations, and the farm management fees in 2019 equaled 5.6% of Integrated CBD's annual budgeted cost per acre, which is well within the industry range of 4.6%-6.5%. Further, Integrated CBD's 2019 farming budget covers only a ten-month period, and if the budget were annualized, Integrated CBD would have paid a fee of 4.7% of the budgeted farming cost per acre, which is at the low end of the industry range.

53.    If Integrated CBD did not use those farm management services, it would have been unable to meet the projected milestones and have a spring hemp crop in 2019. Within 60 days of the closing of the pre-seed round of funding, Integrated Ag's farming team began

preparing the soil for hemp by planting cover crops such as sunn hemp.[5] Absent a spring

hemp crop, Integrated CBD would have had no possibility of revenue in 2019, putting the

company at a massive disadvantage compared to competitors who were producing a crop

that year.

54.    From its inception until early fall of 2019, Integrated CBD also met and

exceeded many of its projected fundraising milestones. In March 2019, Plaintiffs raised $10

million of seed round capital from institutional and accredited-investor individual investors.

Between April and October 2019, Integrated CBD raised and had commitments for over $50

million of additional capital and financing via a combination of secured debt ($30 million

credit facility), Series A Convertible Note ($9.249 million), Series A units ($7.265 million

raised and additional $4.2 million committed and documents signed). Integrated CBD also

obtained an Equipment Lease facility of $15 million (at 65% advance rate) and a second

Equipment Lease facility of $5.5 million (at 100% advance rate). The $4.2 million in

committed capital in the Series A came from a London-based hedge fund Hadron Capital

that had previously made significant investments in the cannabis industry. Even as Hadron

was unable to perform on the subscription documents it had executed due to fundraising

difficulties, its Chief Investment Officer Marco D'Attanasio saw exceptional potential in

Integrated CBD:

> [O]ur fundraise[ing] efforts have proven extremely disappointing so far… In current markets your company is frankly the only new one in which we would invest with confidence if we had the capital… We are big fans of yours and believe you will be ultimately successful.

---

[5] Sunn hemp, when used as a cover crop, can improve soil properties, reduce soil erosion, conserve soil water, and recycle plant nutrients

20

55.     Jefferson, through his entity BRJ Holdings III, LLC, loaned $2.5 million to Integrated CBD via the Series A Convertible Promissory Note ("Convertible Note") round in May 2019. Jefferson, who manages his own family office investing in hedge funds, private equity funds, and private companies and manages $12.2 billion of capital at Hildene, is arguably one of the most sophisticated investors in the world and has deep expertise in credit and distressed debt investments – exactly the type of investment he made in Integrated CBD.

56.     As the largest – and most sophisticated – investor in the round, Jefferson led the negotiation of the terms of the investment for himself and other investors in the round. Over the course of several weeks, Jefferson and BRJ Holdings III, LLC, represented by the national law firm Pepper Hamilton LLP[6], carefully negotiated the terms of the Convertible Note agreement. As a Convertible Note holder, Jefferson became Integrated CBD's creditor, with an option to convert that debt into equity, and which debt would automatically convert into equity if certain terms of the Convertible Note were met.

57.     On August 29, 2019, Integrated CBD entered into a Loan Agreement for a $30 million debt facility from CEOF Holdings L.P. and Corbin Private Credit Opportunity Fund II, L.P. (collectively, "Corbin Capital"). Under the Loan Agreement, Corbin Capital agreed to provide up to $30 million of financing to Integrated CBD.

58.     When Corbin Capital signed the Loan Agreement, it became the company's largest and most senior creditor and obtained the first lien on all company collateral and assets. As a result, Integrated CBD now had two groups of creditors: senior lender Corbin

---

[6] In July 2020, Pepper Hamilton LLP and Troutman Sanders LLP merged. The merged firm is now referred to as "Troutman Pepper."

Capital and subordinate lenders Convertible Note holders, including Jefferson. This necessitated the negotiation and execution of an inter-creditor agreement between Corbin Capital and Convertible Note holders. An inter-creditor agreement is an agreement between two or more creditors that stipulates in advance how their competing interests would be resolved and how they would work in tandem to realize their mutual collateral.

59.     Once again, as the lead Convertible Note holder, Jefferson negotiated the Intercreditor Agreement with Corbin Capital. The Intercreditor Agreement determined how the shared collateral would be divided and sold, and how any proceeds would be distributed among creditors in the event of default, among other things. Under the Intercreditor Agreement, Corbin Capital, as the senior lender, would have sole authority with respect to initiating any enforcement action or otherwise acting (or refraining to act) on the shared collateral or Integrated CBD in the event of default.

60.     Importantly, under the Intercreditor Agreement, Jefferson agreed to a "Standstill," which meant that he could not take action to enforce his rights as Integrated CBD's creditor until Corbin Capital's obligations had been paid in full. This is a common provision between senior and subordinate lenders, and Jefferson, as an experienced credit investor represented by sophisticated and experienced legal counsel, was well aware of how it affected his rights.

61.     Up until and through October 2019, Integrated CBD was on track to meet its projected milestone of becoming a public company in early 2020. To that end, Integrated CBD: (i) sourced and hired renowned national law firm Latham & Watkins to handle its Series B fund raise and IPO-related legal work; (ii) engaged an accounting and audit firm

Ernst & Young as its auditor; (iii) engaged an IPO readiness consultant Morgan Franklin; (iv) engaged an IPO financial printer Donnelly Financial; (v) met with NASDAQ and NYSE staff on several occasions; and (vi) reserved the ICBD ticker symbol.

### Late 2019 Demise of the Industrial Hemp and CBD Industry

62.    Despite their best efforts and continued perseverance, Integrated CBD – like all companies in the CBD industry – was hit by countervailing market and regulatory forces in late 2019. Namely, the FDA assumed regulatory authority over hemp-derived products and declared in numerous warning letters in November 2019 that certain CBD products violated the federal Food Drug & Cosmetic Act, essentially rendering them illegal. This put CBD in a regulatory limbo, whereby the FDA told companies that they could not add CBD to food or beverages until it devised a set of rules, and then failed to provide any guidance regarding those products in the marketplace. This regulatory action crushed the supply-demand balance for CBD and hemp and sent prices plummeting to pennies on the dollar, compared to their cost to produce.

63.    While the FDA had previously issued a series of warning letters to the same effect since as early as spring 2019, neither Integrated CBD nor its investors, which included large institutions, foresaw that it would fundamentally impact Integrated CBD's ability to execute its business plan because food and beverage was one of the many potential end markets. The FDA's November 2019 announcement, however, was significantly more detrimental to the industry than the earlier letters, stating that the FDA could not conclude that CBD was generally recognized as safe (GRAS) for use in human or animal food.

64.     As a result, although hemp acres planted quadrupled in 2019, the regulatory uncertainty has severely hampered the production of hemp and CBD from late 2019 through present day. Large companies that were developing CBD products, including Ben & Jerry's, Unilever, and Anheuser-Busch, were unable to follow through with their plans and launch CBD products. This led to a severe supply-demand imbalance and caused hemp and CBD prices to plummet significantly below their cost of production. Hampered by the FDA's regulatory intervention, the market conditions for hemp growers and CBD ingredient manufacturers continue to decline through present day and prices have fallen even further, as CBD brands enjoy the artificially low input costs and increased profits.

65.     The cannabis industry also generally saw a sharp decline in investment activity as a result of weak industry performance. Public cannabis companies' shares took a hit during the summer 2019, posting losses and selling less cannabis than expected. The entire sector dropped on average 50%, with some companies declining as much as 60% in value. As a result, the limited group of investors investing in the industry – family offices, Canadian retail investors, and hedge funds – suffered significant investment losses over the summer and stopped investing further capital into both private and public companies. Because traditional private equity and other traditional long-only funds were not yet investing in the hemp industry, the depth of available capital was not there to support the market at any price, further exacerbating the situation.

66.     Nevertheless, Integrated CBD pressed forward with its next round of financing, working with several investment banks alongside the lead investment bank BMO Capital Markets ("BMO") to raise its Series B round. In October 2019, BMO, in collaboration with

Integrated CBD, prepared an investor presentation to use in connection with the Series B funding round. The presentation was reviewed by Integrated CBD's outside counsel, Latham & Watkins; BMO's counsel Shearman & Sterling; and Integrated CBD's in-house counsel and executive team prior to being distributed beginning in early October 2019. The presentation fully disclosed the FDA's statements and warnings issued prior to the completion and distribution of the presentation.

67.     In January 2020, after a difficult few months on the road fundraising in what had become a capital desert for both cannabis and hemp companies, Horsman decided to lead by example to instill confidence in Integrated CBD's investors and invested an additional $571,000.00 of his personal capital into the company in two separate transactions in January and March 2020.[7] Unfortunately, this was not sufficient to overcome the overall decline of the CBD industry, and by February 2020, it became apparent that the company could no longer meet its projected benchmarks and milestones and was running out of cash.

### Jefferson Threatens to Destroy Plaintiff's Reputation Unless He Returns the Full Amount of Jefferson's Investment

68.     On or around January 10, 2020, Integrated CBD held a call with Jefferson, during which Jefferson was informed of the current status of the company and the need for immediate funding. On January 14, 2020, Integrated CBD held a company-wide investor update call and informed all investors in attendance that the company was running low on cash and that it had been extremely difficult to raise capital, even with the help of nine investment banks working on the raise, due to industry-wide fundraising difficulties. On that

---

[7] Horsman and his family previously invested $747,000 in Integrated CBD in earlier rounds.

call, Horsman announced that he would personally invest additional capital into the company to lead the next round of funding in hopes of attracting other investors and giving the company time to work through its cash flow issues.

69.    Following that call, on January 27, 2020, Jefferson emailed Horsman to inform him that, instead of converting his and other Convertible Note holders' debt to equity, he wanted to remain a creditor and get paid when Integrated CBD sold its collateral (refined CBD oil and hemp biomass).

70.    At this point, Jefferson's communications to Horsman took on a hostile tone, and Jefferson demanded that Integrated CBD revise the terms of the Convertible Note to make them more favorable to Jefferson and threatened to publicly impugn Horsman's character and reputation if Horsman did not comply with his demands. Jefferson's demands included a "second lien" for his Convertible Note that would have been detrimental to other investors in the company and made it much more difficult to raise capital to keep the company running.

71.    In response, Horsman appealed to Jefferson's reason and business judgment and implored him to work collaboratively to salvage any chance that Integrated CBD may have had at that point to raise additional capital and restore the company's operations:

> We are 100% focused on raising capital[,] which is your only chance at a recovery.  Fighting over legal issues isn't a good use of any of our time right now. I tried to negotiate with you in good faith to reach a resolution and I'm happy to continue to do so. We don't believe giving you a second lien is in the best interest of the company right now as it will complicate our ability to bring in new investors. We don't want to add any additional road blocks to getting funding.

Our lawyers and Corbins [sic] lawyers have advised that there is a standstill in place. Corbin is working with us constructively and we would welcome the same participation from you.

We have 3 large investors in process which are each interested in writing $10-15M checks each. We have $3.5M in near term commitments circled and have raised $620K in the last 10 days. Adding a lawsuit will scare away the capital that we have been working so hard to bring in.

Gencanna one of our large competitors filed for BK today. **********.google.com/amp/s/***.wsj.com/amp/articles/cbd-producer-gencanna-files-for-bankruptcy-11581029308

Our current situation is not unique to our business the entire cannabis industry is in a full[-]blown liquidity crisis. We need your help to get through this.

72.    In response, Jefferson threatened to "expose" Horsman under the guise of exercising his fiduciary responsibility:

Patrick[,] as an investment professional[,] I am very proud of my success as an investor. However, that does not compare to my performance as a fiduciary. I treat my investors with candor and respect. I answer every request in a forthright manner and my integrity has never been in question. You have lied and misled me. Your schemes and the way you have disrespected me and the other INVESTORS in our group is intolerable. I am going to exercise my fiduciary responsibility to society and expose you.

73.    Explaining that he, too, was acting in the best interests of Integrated CBD's shareholders in refusing to revise the terms of Jefferson's loan, to the detriment of the shareholders, Horsman replied:

I have never lied to you nor to any other investor. I also hold my role as a fiduciary in the highest importance which is why I'm not willing to do things just for you and the other Series A convert holders that are not in the best interest of the company and all investors.

It's unfortunate that we have run out of money in the middle of an extensive CapEx project. I'm working as hard as I can to raise money to support the business and investing my own money to sustain it and give us all additional

runway. This is an industry wide phenomenon and not unique to our company. Your acquisitions [sic] are hurtful and untrue.

I know you are upset[,] and I empathize with that[,] but we need your support or at a minimum some time which will provide you and the other investors the best opportunity to get a recovery. I am operating in your best interest and the best interest of the company trying to raise the funding we need to continue.

74.    Jefferson continued to pressure Horsman to cave to his demands. Even after Horsman explained (above) why he could not revise the terms of Jefferson's loan at the expense of the company's shareholders, Jefferson continued asking for additional protections such as a second lien on Integrated CBD's assets. That demand came over eight months after Jefferson had already negotiated the terms of BRJ Holdings III, LLC's Convertible Note back in May 2019 and Integrated CBD had closed on subsequent funding, including from Corbin Capital.

75.    When Horsman did not give in to Jefferson's demands, to demonstrate that he fully intended to follow through on his threats to publicly impugn Horsman's character, on February 6, 2020, Jefferson e-mailed Corbin Capital's counsel, accusing both Horsman and Corbin Capital of running a Ponzi scheme and threatening make his accusations public and invite regulatory scrutiny:

We will not turn a blind eye to this PONZI SCHEME and unless we can get reassurance that all parties are proceeding in legal fashion then we will pursue getting a judgement [sic]. If your client disagrees then they can appear in court and discuss the merits of our claims and then they can explain to the regulators why they are assisting in this PONZI SCHEME.

76.    Surprised by Jefferson's baseless threats, Corbin Capital made inquiries about Jefferson's reputation in the investment industry, to determine whether anyone else has had a similar experience with Jefferson in the past. It turns out that this was a typical pattern of

28

behavior for Jefferson, who commonly threatens meritless legal action to get his way and is a serial litigant, with a decades-long history of suing his business partners and associates.

77.    Despite Jefferson's incendiary e-mails to Horsman and Integrated CBD's investors, Horsman continued to appeal to Jefferson's professionalism. Horsman also reminded Jefferson of the terms of his Intercreditor Agreement with Corbin Capital, under which Integrated CBD could not satisfy any obligations to Convertible Note holders until it fully repaid its obligations to Corbin Capital:

> Brett, I like you[,] I respect you and I look up to you. The way you have been treating me with unfounded and untrue personal attacks over the last few weeks is unacceptable and if that's how you want to act[,] I don't want to engage. There is a standstill in place via the intercreditor so we can just sit here and do nothing and try to work on more important things like raising capital, selling product and generating revenue.

> I'm a reasonable, logical and professional business person [sic] and you can ask anyone who knows me including Corbin how I have been acting in the best interest of all investors through this situation in a highly cooperative manner including putting up $500K of my own capital when no one else was willing to put a dollar into the business.

> If you want to be constructive and try to help work out a solution[,] we would be happy to do so. If you want to attack us and make threats[,] I just don't think that's a good use of my teams [sic] time.

78.    Instead of engaging in a constructive discussion, Jefferson again threatened to smear Horsman's reputation in the press, stating in an e-mail to Horsman that, "I wouldn't give a second thought to discussing someone who crossed me [with the Wall Street Journal] . . . So it is very simple let's think of a way to break up and let's make sure that we all know how it is going to work."

79.    On February 24, 2020, Integrated CBD's executive team held a phone call with Convertible Note holders, including Jefferson. On the call, Horsman once again explained to

Jefferson the gravity of Integrated CBD's financial condition and that Corbin Capital was going to foreclose on its assets. Horsman further explained that the only way to recover value for investors would be to raise the next round of capital to keep the company alive. Jefferson understood that if Corbin Capital – the senior creditor to his Convertible Note – foreclosed on the company's assets, Jefferson would have no recovery. To mitigate the situation, Jefferson offered to help Horsman look for investors and make introductions. Although Jefferson never followed through on his offer of help, his threats temporarily ceased.

80.    On March 2, 2020, the company's senior creditor Corbin Capital notified Integrated CBD of its intent to foreclose on the company's remaining assets. Corbin had previously demanded that Integrated CBD install a Chief Restructuring Officer to oversee the restructuring process, and the company installed one on February 21, 2020. The company also received notices of default from its landlords on both the farmland leases and the building lease for its hemp processing facility.

81.    Several months later, on April 11, 2020, Defendant Lev reached out to Horsman asking for an update on Integrated CBD. Horsman complied and had multiple conversation with Lev, updating him on the business and providing him requested financial information, bank statements, and credit card statements. Unhappy that his investment did not work out the way he wanted to – despite acknowledging the risks of early-stage company investing, including complete loss of investment, in the subscription agreement – Defendant Lev decided that, instead of accepting the economic reality of the loss of his investment, he would demand his money back. On May 14, 2020, Lev reached out to Horsman and made extensive requests for additional sensitive financial information unrelated to Integrated CBD

(e.g., payroll records, bank statements, all employment and lease contracts, all vendor invoices) from several Integrated Ag affiliates and Horsman's personal holding entity. Acknowledging that he made that request solely to harass Integrated CBD's team and coerce Horsman to pay him off, Lev stated that if Horsman were to "send back my 50k instead of going through this exercise I'd gladly accept…."

82.    On May 27, 2020, Integrated CBD's executive team met with Lev and several others. During that meeting, Lev continued to request extensive financial information from Integrated CBD as well as several other entities. Integrated CBD's team explained to Lev that, because he was not a shareholder or principal in those other entities, he was not entitled to those entities' confidential and sensitive information, but they were willing to share it with Lev if he signed a non-disclosure agreement. Lev declined to do so, yet he persisted in making his unsubstantiated requests and again told Horsman that he would continue doing so – and waste Integrated CBD's team's time – unless Horsman paid him $50,000.

83.    It was at this point that Lev turned to Jefferson to embark on a concerted plot to force a refund of their investments in Integrated CBD. On information and belief, Lev and Jefferson entered into an agreement whereby Jefferson would threaten (and eventually follow through on his threat) to expose Horsman's allegedly illicit behavior to strong-arm him into succumbing to their threats. This extortive behavior was unsuccessful.

84.    With Lev's aid and encouragement, in June 2020, Jefferson resumed his threats. The focus of Jefferson's demands shifted, however, and began to echo those of Lev just several weeks earlier. Peculiarly, Jefferson's requests for information outlined in his June 25, 2020 e-mail to Horsman repeated verbatim Lev's requests from May 14, 2020. Now,

instead of demanding to revise the terms of his Convertible Note, Jefferson began asking for financial information relating to Integrated Ag's affiliates and Integrated CBD and demanded a return of the entire amount of his loan to Integrated CBD.

85.    Defendants' unrelenting threats escalated on August 10, 2020, when Ryan Andrews, counsel acting on behalf of Jefferson and Lev, sent a letter to Horsman's counsel demanding that Horsman return ***all*** of their investments, despite acknowledging that his clients would obtain a "much smaller judgment" in court. In the same letter, Mr. Andrews, used the threat of initiating a baseless FINRA investigation to pressure Horsman into settling, noting that if Horsman refused to agree to their unreasonable terms, "a blacklist from fundraising will be received as a victory." Mr. Andrews also threatened that "if [his] client prevails on a breach of fiduciary duty claim against [Horsman], [Horsman] will be out of the raising capital business forever," despite the fact that BRJ Holdings, in its capacity as a lender, as opposed to an investor, could not and did not pursue such a claim.

86.    Jefferson followed Mr. Andrews's letter with a menacing email on August 11, 2020:

> Corbin are a bunch of scumbags who can't come up with an original idea on their own. I am not sure of what you and [they] have going… ***The question for you is what happens to you.***

(Emphasis added.)

87.    In a text message the same day, on August 11, 2020, Horsman suggested to Jefferson that they attempt to resolve the matter out of court and on reasonable terms, but Jefferson was unreceptive. The following week, on August 19, 2020, Jefferson emailed Horsman and threatened to use the press to seek repayment of the entirety of his investment:

I will [sic] contacting CNBC to sell you "Patrick the scam artist" to American Greed so they can also alert everyone.  Please note that I will also be contacting major media contacts I have to make sure that [sic] know about your antics… ***it won't be hard to get you put away***… Patrick Fuck You we are going to war!!

(Emphasis added.)

88.    Finally, in another e-mail to Horsman, Jefferson reiterated that if Horsman did not give him what he wanted – a complete return of his company's investment – Jefferson would do so much damage to Horsman's professional reputation by accusing him of fraudulent conduct that Horsman "will need to find a new line of work."

89.    Not once did Jefferson explain which conduct he considered fraudulent or on which alleged misrepresentations he relied on when he became the company's creditor. Instead, he dangled the threat of a lawsuit alleging fraud – which he knew would ruin Horsman's reputation in the investment industry and destroy his career – to extort $2.5 million from Horsman, who Jefferson acknowledged was "a wealthy man [who has] done well" in the investment management business.[8] Jefferson even admitted on a phone call to Horsman on July 17, 2020, that, while he could not point to any specific fraudulent acts, he would come up with something to make good on his threats.

90.    When those threats failed to lead to the result they wanted, Defendant Jefferson followed through on his threats to spread false information and publicly accused Horsman of unlawful conduct and disgrace.  BRJ Holdings III, LLC filed a groundless and frivolous action in Maricopa County Superior Court on October 2, 2020 ("The Frivolous BRJ

---

[8] Investment managers, like Horsman, owe fiduciary duties to their clients, and the industry is extremely sensitive to any wrongdoing; even mere accusations of fraud are fatal to careers and businesses.

33

Complaint")  Thereafter, Jefferson, acting in his personal capacity and not as  a party to the Frivolous BRJ Complaint  (and therefore not entitled to immunity for defamatory allegations made in litigation) personally published the same false  allegations in the Frivolous BRJ Complaint to Horsman's existing and prospective business associates, clients, acquaintances, and friends. Defendant Lev also published the fictitious allegations in the Frivolous BRJ Complaint to other members of his golf club, where he and Horsman are both members, along with many others in the local investment and agricultural industries. All of the  material allegations in the Frivolous BRJ Complaint are false.

91.    For example, the Frivolous BRJ Complaint falsely alleges that Integrated CBD's Paycheck Protection Program ("PPP") loan funds were not paid to employees and creates a false innuendo that Horsman used the funds to purchase a private jet. Integrated CBD's PPP loan funds were not used ***period***. The company received PPP loan proceeds totaling approximately $218,089.00 on May 7, 2020, and the funds were garnished by a creditor. Integrated CBD challenged the garnishment in court, and the court ordered to release the funds on September 30, 2020. Integrated CBD repaid the entire PPP loan, plus interest, back to the federal government shortly thereafter on October 13, 2020.

92.    The Frivolous BRJ Complaint also makes a litany of incoherent, false allegations supposedly provided by an anonymous director of Integrated CBD's farming leadership team. That "director" is Dave Dickson, who was, in fact, Integrated CBD's crop consultant. After the Frivolous BRJ Complaint became public, Dickson reached out to a former Integrated CBD partner and let him know that the complaint overstated and mischaracterized what he had told Defendants' representatives. Defendants, therefore, were

fully aware that those allegations were not true when they made them, and they made them with the sole purpose of punishing Horsman for not succumbing to their threats and to ruin his reputation and career, depriving him of his ability to earn a living.

93. Further, the Frivolous BRJ Complaint falsely alleges that Horsman misused Integrated CBD's funds for his personal purposes. The sole basis for that accusation is that one of Integrated CBD's corporate credit cards had been "personally guaranteed" by Horsman. The personal guarantee was a requirement imposed by the credit card issuer, American Express, whereby an officer of the company had to be personally responsible for the company's credit card transactions in the event the company did not pay the bill.

94. The accusation that Horsman misused the company credit card was false, and Defendants knew that it was false when BRJ Holdings III, LLC filed the complaint and Jefferson personally published the defamatory statements in the Complaint to which he was not a party, because, in the months leading up to the filing, Defendants requested and reviewed Integrated CBD's credit card and banking statements. Defendants, having seen the credit card statements, knew that the purchases charged to Integrated CBD's corporate American Express card were made for Integrated CBD – not for Horsman personally.

95. For example, the largest of the allegedly personal purchases were for fertilizer ($422,000.00), equipment fuel ($287,000.00), seedling germination ($188,000), welding ($310,000.00), steel ($50,000.00), concrete ($121,000.00), farm equipment ($209,000.00), lab equipment ($136,000.00), and lab testing services ($27,000.00). Less than 4% of the charges on the company credit card were for executive travel and meals, all of which were valid and appropriate expenses related to Integrated CBD's business. American Express also

provided a working capital loan program to Integrated CBD, under which Horsman was personally responsible if the company were unable to repay the loan. Nevertheless, even having reviewed the actual charges on the company credit card statements, Defendants made their false, inflammatory, and malicious accusations knowing full well that doing so would irreparably damage Horsman's reputation and career and intending that effect – all because Horsman did not succumb to their shakedown.

96.     Four days after the Frivolous BRJ Complaint was filed on October 2, 2020, the Miami Herald published a story about the case. The story included a link to a copy of the complaint that was ***not stamped by the court***, meaning that Jefferson followed through with his threat to use the press and alerted the media regarding the details of the not-yet-filed civil action. The story falsely suggested that Horsman misused PPP funds to purchase a private jet and included information regarding some of Horsman's real estate holdings that were not even discussed in the publicly-filed complaint.

97.     Curiously, throughout their attempts to extort Horsman, neither Jefferson nor Lev accused Horsman of most of the misconduct they now allege in the complaint, even though all of the alleged misconduct would have been known to both Jefferson and Lev all along.[9] This is because Defendants knew that Horsman had not done anything wrong. Only when their threats failed, unable to extort the return of their entire investment, did Defendants come up with new, fictitious accusations against Horsman solely to make good on their threats and destroy Horsman's reputation and ability to earn a living.

---

[9] Jefferson and Lev questioned – and Integrated CBD explained in detail both verbally and over email – the transactions with Integrated Ag's affiliates and large credit card payments for farm labor, equipment, fertilizer, et al. *See* ¶ 87, *infra*.

98.    As recently as January 5, 2021, Jefferson once again threatened Horsman that if Horsman did not pay him and Lev the full amount of their investment, they would cause additional plaintiffs to join the lawsuit against Horsman, which would in turn increase Horsman's costs of defending against the lawsuit. Conversely, if Horsman paid Jefferson and Lev off now, then "we will disappear" and "others will not have the commitment or staying power to continue." Jefferson's assertion that he can direct others to pursue or forgo legal action against Horsman as it suits his interests confirms that Jefferson's sole concern is getting paid off – not rectifying any alleged (and nonexistent) wrongdoing.

99.    In sum, Defendants are abusing the legal process as a tactic in their attempt to extort money from Horsman as a result of a failed investment in an industry that experienced severe financial turmoil over the past year. While Defendants may be trying to hide behind legal terms, their scheme is clear for what it is: an old-fashioned shakedown.

### Ruinous Aftermath of Defendants' Unlawful Acts

100.    Defendants' relentless threats and extortion attempts took an extreme toll on Horsman's physical and mental health and wellbeing. Already under enormous stress from the sudden and disastrous market and regulatory developments in the hemp and CBD market that eventually led to the demise of his company, Horsman now had to live in constant fear that Defendants would humiliate him and smear his good name and reputation if he did not cave to their demands.

101.    Once Defendants followed through on their threats and publicly accused Horsman of fraudulent conduct, Horsman's entire professional life crumbled, and he became a pariah to his now-former business partners and associates, clients, and friends in the

investment industry. Within days of the filing of the complaint and as a result of Defendants' public smear campaign against him, Horsman was forced to resign from Blue Sand Securities and Merion Investment Management, where he had been a Partner and Founder since 2002 and 2009, respectively.

102.    Several other business partners and counterparties severed their relationships with Horsman's businesses and demanded that Horsman not be involved if the relationships were to continue. For example, Triangular Capital Partners LLC demanded to terminate its agreement with Esoteric Investments LP, where Horsman is a Chief Investment Officer, and demanded "recusal of Patrick Horsman from any direct or indirect involvement with Triangular in any capacity until matters related to the fraud claims have been . . . dismissed." Integrated Ag likewise experienced a significant fallout as a result of Defendants' malicious smear campaign, which completely froze Integrated Ag's deal flow and caused at least one joint venture, Amande Glen Farms LLC, to terminate its management agreement with Integrated Ag. And every day that Defendants are allowed to communicate their false and defamatory statements and besmirch Plaintiff, Plaintiff continues to incur further harm to his reputation and existing and prospective business expectancies.

103.    Plaintiff has also been denied credit to refinance personal mortgages due to "open issues" in connection with the lawsuit, which credit would have allowed him to save a considerable amount of interest over 15 years.

104.    Because Defendants made good on their threat and provided the false narrative and accusations directly to FINRA, FINRA initiated an inquiry into Horsman's conduct,

causing Horsman to spend over $600,000 (to date) to hire legal counsel to oversee the inquiry.

105.    Overnight, Horsman lost almost the entirety of his livelihood – all because he continued to act in the best interests of Integrated CBD's shareholders and stood up to Defendants' extortion demands.

106.    As a result of Defendants' actions, for the first time in his life, Horsman began to experience symptoms of severe emotional distress in the form of fear, shock, anger, worry, humiliation, anxiety, irritability, and insomnia, causing him to seek professional crisis counseling.

107.    The claims brought against Defendants arise out of their repeated threats to ruin Horsman's investment business and falsely accuse Horsman of unlawful conduct if Horsman did not compensate Defendants. Defendants' conduct was intentional, willful, and wanton and resulted in significant damages, including loss of millions of dollars-worth of business profits and loss of goodwill.

**FIRST CAUSE OF ACTION**
**Civil RICO**
**(Against Defendant Jefferson)**

108.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

109.    Arizona RICO allows a private cause of action for racketeering.

110.    Pursuant to A.R.S. §13-2314.04(A), a person who sustains a reasonably foreseeable injury to his business or property by a pattern of racketeering activity may file an action in superior court for the recovery of up to treble damages and attorneys' fees.

111.    A.R.S. §13-2301 defines racketeering as any act that would be chargeable or indictable under the laws of Arizona, including acts committed for financial gain, including extortion.

112.    A.R.S. §13-1804 defines "extortion" as follows:

A.     A person commits theft by extortion by knowingly obtaining or seeking to obtain property or services by means of a threat to do in the future any of the following:
. . .

5.     Accuse anyone of a crime or bring criminal charges against anyone.

113.    As set out above, Defendant Jefferson repeatedly and continuously threatened Plaintiff that if Plaintiff did not pay Defendant Jefferson money, Defendant Jefferson would contact the public, media, and government authorities and falsely tell them that Plaintiff was misleading investors and engaging in other wrongful conduct. Specifically, Jefferson threatened that if he and Lev did not receive a refund of their investment, he would bring criminal charges against the Plaintiff:

Whether it is  . . . ripping off the US Government by defrauding them . . . I am concerned that as a shareholder of ICBD I have a duty to inform the government that there was no basis for the loan as the company was already closed up. . . after everything I have learned **it won't be hard to get you put away**.  Ryan [Andrews] has been speaking with some "whistleblowers" former employees, and to put it into plain English, you are fucked.

(Emphasis added.)

114.    Defendant Jefferson's threat to wrongfully accuse Plaintiff of unlawful conduct and to disgrace him unless he was paid money was malicious at the time of these communications, and Defendant Jefferson knew or should have known that any statement accusing Plaintiff of wrongdoing with regard to his investors would be false.

40

115.    Defendant Jefferson intended to extort money from Plaintiff by threatening to make said statements.

116.    As a result of Defendant Jefferson's threats and extortion demands, Plaintiff feared that Defendant Jefferson would publicly accuse him of unlawful conduct he did not commit.  Based upon Jefferson's commission of the predicate act of extortion, Plaintiff has been proximately damaged as a consequence of the false accusations of criminal conduct.

117.    When Plaintiff did not succumb to Defendant Jefferson's ultimatum, Defendant Jefferson followed through on his threats to wrongfully accuse Plaintiff of unlawful conduct, publicly disgrace Plaintiff, and ruin his reputation and career.

118.    As a result of Jefferson's extortion, Plaintiff has suffered property losses, both in the form of direct and consequential economic losses, as well as emotional distress.

119.    Plaintiff has been injured by Jefferson's acts of extortion, which were committed for financial gain during Jefferson's racketeering enterprise.

**SECOND CAUSE OF ACTION**
**Aiding and Abetting Civil RICO**
**(Against Defendant Lev)**

120.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

121.    As set out above, Defendant Jefferson extorted money from Plaintiff by threatening to contact the public, media, and government agencies and falsely tell them that Plaintiff was misleading investors and engaging in other wrongful conduct, thereby publicly disgracing Plaintiff and ruining his reputation and ability to make a living.

122.    Defendant Lev knew about and actively participated in Jefferson's unlawful plan whereby Lev contacted Jefferson to devise a way to strong-arm Plaintiff into paying

41

them money, acted in tandem with Jefferson to exert additional pressure on Plaintiff and amplify Jefferson's threats, and Defendants had an arrangement that Lev would financially benefit from any payoff that Jefferson received as a result of his extortion demands.

123.   As a result of Defendant Jefferson's extortion threats, Plaintiff has been damaged, and Defendant Lev's conduct was a substantial factor in causing harm to Plaintiff.

### THIRD CAUSE OF ACTION
**Civil Conspiracy**
**(Against All Defendants)**

124.   Plaintiff incorporates the allegations set forth in the preceding paragraphs.

125.   As set out above, when Defendants realized that their capital investments were lost, they agreed to set out on a conspiracy of illicit conduct to ruin Plaintiff's life. As part of their conspiracy, Defendant Jefferson repeatedly and continuously threatened Plaintiff that if Plaintiff did not pay Defendant Jefferson money, Defendant Jefferson would contact the public, media, and government agencies and falsely tell them that Plaintiff was misleading investors and engaging in other wrongful conduct.

126.   Defendant Lev participated in the conspiracy by acting in tandem with Defendant Jefferson to exert additional pressure on Plaintiff and amplify Jefferson's threats.

127.   The conspiracy between the Defendants culminated in working to defame and impugn Plaintiff's reputation and business standing by falsely accusing Plaintiff of dishonest and fraudulent conduct, which caused Plaintiff's contractual relationships to be severed. Defendants knew that these accusations were false, and they made them to publicly shame and punish Plaintiff and cause the demise of Plaintiff's career and loss of his ability to make a living.

128.    As a result of Defendants' conspiracy, Plaintiff has been damaged.

**FOURTH CAUSE OF ACTION**
**Intentional Interference with Business Expectancies**
**(Against All Defendants)**

129.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

130.    As set out above, Plaintiff and his businesses had contractual relationships with others in the investment industry, namely, Blue Sand Securities LLC, Merion Investment Management LP, Genesis Global Trading, Inc., Esoteric Investments LP, Newgate Capital Holdings LLC, Amande Glen Farms LLC, EJF Capital LLC, and Triangular Capital Partners LLC, among many others.

131.    Defendants were aware of those contractual relationships and Plaintiff's business expectancy with the above-named entities, naming some of them in the Frivolous BRJ Complaint solely to interfere with those relationships because their identities were wholly irrelevant to the allegations. As outlined herein, Jefferson cannot hide behind the absolute litigation privilege because he is not a party to the Frivolous BRJ Complaint.

132.    Defendants intended to harm Plaintiff and his businesses by falsely accusing him of dishonest and fraudulent conduct and causing those contractual relationships to be severed.

133.    As a result of Defendants' conduct, Plaintiff and his businesses suffered actual and presumed damages in an amount that will be proven at trial.

134.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiff's business, and harmed his profits, thus inflicting an irreparable injury.

135.   Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

**FIFTH CAUSE OF ACTION**
**Defamation**
**(Against Defendant Jefferson)**

136.   Plaintiff incorporates the allegations set forth in the preceding paragraphs.

137.   As set out above, Defendant Jefferson has made false and defamatory statements about Plaintiff through the publication of the Frivolous BRJ Complaint to third parties as alleged in Paragraph 90 through 95.

138.   Defendant Jefferson's  false and defamatory statements about Plaintiff were unprivileged and published to third parties as Jefferson was not a party to the Frivolous BRJ Complaint, and therefore not entitled to immunity.

139.   Defendant Jefferson acted at least negligently.

140.   Plaintiff suffered actual and presumed damages in an amount in an amount that will be proven at trial.

141.   Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiff's business, and harmed his profits, thus inflicting an irreparable injury.

142.   Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

### SIXTH CAUSE OF ACTION
**False Light Invasion of Privacy**
**(Against Defendant Jefferson)**

143.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

144.    As set out above, Defendant Jefferson has made false statements about Plaintiff that would be highly offensive to a reasonable person in Plaintiff's position.

145.    Defendant Jefferson's' false statements about Plaintiff were unprivileged and published to the general public in a way that made those false statements a matter of public knowledge.

146.    Defendants acted at least negligently.

147.    Plaintiff suffered actual and presumed damages in an amount that will be proven at trial.

148.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiff's business, and harmed his profits, thus inflicting an irreparable injury. Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

### SEVENTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress**
**(Against Defendant Jefferson)**

149.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

150.    As set out above, Defendant Jefferson repeatedly and continuously threatened Plaintiff that if Plaintiff did not pay Defendant Jefferson money, Defendant Jefferson would contact the public, media, and government authorities and falsely tell them that Plaintiff was

misleading investors and engaging in other wrongful conduct, thereby publicly disgracing Plaintiff and ruining his reputation and ability to make a living.

151.    Defendant Jefferson's threat to wrongfully accuse Plaintiff of unlawful conduct and to disgrace him unless he was paid money was extreme and outrageous, going beyond all possible bounds of decency.

152.    Defendant Jefferson intended to extort money from Plaintiff by threatening to make said statements, and Defendant Jefferson intended his conduct to cause Plaintiff emotional distress, or recklessly disregarded the certainty that Plaintiff would suffer such distress.

153.    As a result of Defendant Jefferson's threats and extortion demands, Plaintiff feared that Defendant Jefferson would publicly accuse him of unlawful conduct and disgrace.

154.    When Plaintiff did not succumb to Defendant Jefferson's ultimatum, Defendant Jefferson followed through on his threat to wrongfully accuse Plaintiff of dishonest and fraudulent conduct, publicly disgrace Plaintiff, and ruin his reputation and career.

155.    Defendant Jefferson knew that his accusations were false, and he made them to publicly shame and punish Plaintiff and cause the demise of Plaintiff's career and loss of his ability to earn a living.

156.    As a result of Defendant Jefferson's conduct, Plaintiff suffered severe emotional distress in the form of fear, shock, anger, worry, humiliation, anxiety, irritability, and insomnia.

157.    Because Defendant Jefferson has been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    For an award of actual and treble damages for a pattern of racketeering under A.R.S. §13-2314.04(A);

B.    For an award of attorneys' fees and costs under A.R.S. §13-2314.04(D);

C.    For an award of prejudgment interest on damages under A.R.S. §13-2314.04(D);

D.    An award of compensatory and punitive damages in an amount to be proved at trial;

E.    All costs and expenses to which Plaintiff is are entitled, including reasonable attorneys' fees as provided by A.R.S. §§ 12-341 and 12-341.01, and as otherwise permitted by law;

F.    Pre-judgment and post-judgment interest; and

G.    Such other and further relief the Court deems appropriate.

RESPECTFULLY SUBMITTED this 14th day of April, 2021.

**FREDENBERG BEAMS**

By:    /s/ Daniel E. Fredenberg
Daniel E. Fredenberg
Christian C.M. Beams
Christopher S. Skinner
*Attorneys for Patrick B. Horsman*

47

# Liddy Legal Support Services

PO Box 2007, Phoenix, AZ 85001
63 E. Pennington St., #102, Tucson, AZ 85702
2700 Woodlands Village Blvd., #300-420, Flagstaff, AZ 86001
Phoenix 602-297-0676, Tucson 520-628-2824, Flagstaff 928-225-7737

JEFF FINE, CLERK

CLERK OF THE
SUPERIOR COURT
RECEIVED CCB #1
DOCUMENT DEPOSITORY

2021 APR 28  PM 2: 54

FILED
BY A. VALENZUELA, DEP

| Client Matter | Horsman/Jefferson |
| Account | # 0861 |
| Invoice | # ----------- |
| Liddy | # 365839-1 |

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

PATRICK HORSMAN,

                    **Plaintiff(s) / Petitioner(s),**

vs

BRETT JEFFERSON, et. al.,

                    **Defendant(s) / Respondent(s).**

**CERTIFICATE OF SERVICE
BY PRIVATE PROCESS SERVER
Case No. CV2021-006034**

**☐ORIGINAL**

**ENTITY/PERSON TO BE SERVED:** Brett Jefferson

**PLACE OF SERVICE:**          225 Tokeneke Rd., Darien, CT 06820

**DATE OF SERVICE:** On the __16th__ day of __April__, __2021__ at __4:55__ PM   County __Fairfield__

☐ PERSONAL SERVICE  ☒ Left a copy with a person authorized to accept service.   ☐ At this usual place of abode, I left a copy with a person of suitable age and discretion residing therein.

**Name of Person Served and Relationship/Title**   Served by leaving the documents with Catherine Jefferson, spouse and co-resident.

on __4/15/2021__ we received the following documents for service:

Summons, Complaint, Certificate of Compulsory Arbitration, and Civil Coversheet

**Received from FREDENBERG BEAMS, ( DANIEL E. FREDENBERG #020158 )**

PROCESS SERVER: Ethan Yade

The undersigned states: That I am a private process server in the county of Fairfield, State of Connecticut.

SIGNATURE OF PROCESS SERVER: _____   Date: __4-20-2021__

**Tax ID# 90-0533870**
I declare under penalty of perjury that the foregoing is true
and correct and was executed on this date.

WILENCHIK & BARTNESS
— A PROFESSIONAL CORPORATION —

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810          Facsimile:  602-606-2811

John "Jack" D. Wilenchik, #029353
admin@wb-law.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| PATRICK B. HORSMAN, an individual, | Case No. CV2021-006034 |
| Plaintiff, | |
| vs. | **DEFENDANTS' MOTION FOR EXTENSION OF TIME TO FILE ANSWER OR RESPONSIVE PLEADING** |
| BRETT R. JEFFERSON, an individual; and IAN LEV, an individual, | **(Assigned to the Honorable Joseph Mikitish)** |
| Defendants. | |

Defendant Brett Jefferson and Defendant Ian Lev, specially appearing for the purpose of filing this motion[1] by and through undersigned counsel, hereby file this Motion for Extension of Time to File Answer or Responsive Pleadings, and respectfully request that the Court enter an Order granting a three-week extension of time in which to file their responsive pleadings directed at Plaintiff's Complaint, by and through June 7, 2021. Defendants' counsel asked Plaintiff's counsel for the extension as a matter of routine professional courtesy but was strangely refused the request. Plaintiff filed this action on April 14, 2021 and Defendants' Answers would otherwise

---

[1] Defendant Brett Jefferson makes a special appearance so as not to waive any argument relating to lack of personal jurisdiction under Ariz. R. Civ. P. 12(b)(2), which he expects to assert in a forthcoming responsive pleading (*i.e.*, motion to dismiss).

be due on May 17th and May 19th. The additional time is needed for Defendants' out-of-state counsel to obtain *pro hac vice* status for this matter and prepare and file responsive pleading(s). Defendant Lev and Plaintiff Horsman are already engaged in related litigation here in Maricopa County, in which the same counsel are involved on both sides (and it is not clear why this action was filed separately). So the request is clearly not sought for purposes of undue delay and frankly Plaintiff's filing of a separate action raises concerns about whether Plaintiff filed this action for purposes of delay or harassment. A more detailed recitation of the basis for this request follows.

1.      Defendant Jefferson was served on or about April 16, 2021. Accordingly, Defendant Jefferson's responsive pleading is due May 17, 2021. Ariz. R. Civ. P. 4(m).

2.      Defendant Lev was served on or about April 29, 2021. Accordingly, Defendant Lev's responsive pleading is due May 19, 2021. Ariz. R. Civ. P. 12(a)(1)(A)(i).

3.      Out-of-state counsel for Defendant Jefferson and Defendant Ian Lev is currently in the process of gathering the requisite materials to submit their forthcoming applications for admission *pro hac vice* in this action, while working with local undersigned counsel and preparing responsive pleadings directed at the Complaint. Out-of-state counsel has already been admitted *pro hac vice* in the related action of *Lev v. Horsman*, Maricopa County Superior Court Case No. CV2020-012256, filed on October 2, 2020.

4.      Defendant Jefferson and Defendant Lev therefore respectfully request a modest extension of time in which to file a responsive pleading, such that each of their responsive pleadings shall be due on or before June 7, 2021. No need or request for any further extension of time for Defendant Jefferson and Defendant Lev to file a responsive pleading is anticipated at this time.

5.      Counsel for Defendant Jefferson and Defendant Ian Lev conferred with counsel for Plaintiff Horsman, requesting the extension sought herein as a professional courtesy and for the reasons set forth herein (i.e., to gather the requisite materials to submit applications for admission in this case *pro hac vice*, as well as prepare responsive pleading[s]). Plaintiff's counsel declined to grant the modest extension requested herein.

6.      Defendant Brett Jefferson and Defendant Ian Lev therefore respectfully request that the Court enter an Order granting this Motion and extending the time for Defendant Jefferson and Defendant Lev to file a responsive pleading through and including June 7, 2021.

A proposed form of Order is lodged contemporaneously herewith.

**RESPECTFULLY SUBMITTED** on May 4, 2021.

**WILENCHIK & BARTNESS, P.C.**

*/s/ John D. Wilenchik*
John "Jack" D. Wilenchik, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com
*Attorneys for Defendants*

**ELECTRONICALLY** filed on May 4, 2021,
via AZTurboCourt.com.

**COPY** electronically transmitted by the
Clerk of the Court via AZTurboCourt.com
to the Honorable Joseph Mikitish.

**COPY** electronically transmitted
via AZTurboCourt.com and email
on May 4, 2021 to:

Daniel E. Fredenberg, Esq.
Christian C. M. Beams, Esq.
Christopher S. Skimmer, Esq.
**FREDENBERG BEAMS**
4747 North 7th Street, Suite 402
Phoenix, AZ 85014
dfredenberg@fblegalgroup.com
cbeams@fblegalgroup.com
cskinner@fblegalgroup.com
*Attorneys for Plaintiff*

By: */s/ Christine M. Ferreira*

WILENCHIK & BARTNESS
— A PROFESSIONAL CORPORATION —

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810         Facsimile:  602-606-2811

John "Jack" D. Wilenchik, #029353
admin@wb-law.com
*Attorneys for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| **PATRICK B. HORSMAN, an individual,** | **Case No. CV2021-006034** |
| **Plaintiff,** | |
| **vs.** | **ORDER TO EXTEND DEADLINE FOR DEFENDANTS TO FILE ANSWER OR RESPONSIVE PLEADING** |
| **BRETT R. JEFFERSON, an individual; and IAN LEV, an individual,** | **(Assigned to the Honorable Joseph Mikitish)** |
| **Defendants.** | |

Based upon the Defendants' Motion for Extension of Time to File their Answer or Responsive Pleading to the Complaint and good cause appearing,

IT IS HEREBY ORDERED that the Defendants shall file their Answer or Responsive Pleading on or before June 7, 2021.

ELECTRONICALLY DATED AND SIGNED.

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
5/7/2021 2:30:17 PM
Filing ID 12868744

**FREDENBERG BEAMS**
Daniel E. Fredenberg – 020158
Christopher S. Skinner – 032781
4747 N. 7th Street, Suite 402
Phoenix, Arizona 85014
Telephone:  602/595-9299
Email: dfredenberg@fblegalgroup.com
Email: cskinner@fblegalgroup.com
*Attorneys for Patrick B. Horsman, Jeffrey M. Dreyer, Ari M. Schiff, Integrated AG XI, LLC, Integrated AG XI AZ LLC, Integrated AG XII, LLC, Integrated AG Holdings LLC, Integrated AG Holdings AZ LLC, Integrated AG LP, Integrated AG Equipment LLC, IAG Equipment LLC, Integrated AG Management LLC, Integrated AG Operations LLC, Verified Organic LP, Verified Organic LLC, and AZ Farm Management LLC*

**SUPERIOR COURT OF ARIZONA**
**COUNTY OF MARICOPA**

IAN LEV, an unmarried man; JACKCARLISLE, an unmarried man; JOHN SCANNELL, an unmarried man; OBD PARTNERS, LLC, a Delaware limited liability company, and BRJ HOLDINGS III, LLC, a Nevada limited liability company,

Plaintiffs,

v.

PATRICK B. HORSMAN, *et al.*,

Defendants.

Case No.  CV2020-012256

| | |
|---|---|
| PATRICK B. HORSMAN, an individual, | Case No.  CV2021-006034 |
| Plaintiff, | **MOTION TO CONSOLIDATE** |
| v. | |
| BRETT R. JEFFERSON, an individual, and IAN LEV, an individual, | |
| Defendants. | |

## I.    INTRODUCTION.

When two courts are confronted with common questions of law or fact, it is commonplace to consolidate the separate matters under one case number. And that is exactly what the Court should do in this litigation. This dispute has a companion case, *Horsman v. Jefferson, et al.*, CV2021-006034, that shares common questions of law or fact – predominantly, whether Defendant Patrick Horsman fraudulently obtained investments from Plaintiffs Ian Lev and BRJ Holdings III, LLC[1] – warranting consolidation. Additionally, consolidation would benefit both Mr. Horsman and the relevant Plaintiffs, providing consistent adjudication of the common issues and reducing the burden on the judicial system. Consequently, Mr. Horsman respectfully requests that the Court utilize its discretion under Ariz. R. Civ. P. 42(a) and consolidate this case with its companion, under the CV2020-012256 case number.

---

[1] Though Mr. Jefferson personally is not a plaintiff in this matter (he is personally a defendant in CV2021-006034), he is the sole member of plaintiff BRJ Holdings III, LLC, through which he made his investment in Integrated CBD. For the ease of reference and solely for the purposes of this Motion, any references to "Plaintiff Jefferson" shall include both Mr. Jefferson and BRJ Holdings III, LLC.

2

## II.    FACTUAL BACKGROUND.

On December 11, 2018, Congress passed the 2018 Farm Bill, which drastically transformed hemp policy in the United States. (*See* **Ex 1**. at 13:23-24). The Farm Bill permitted the transfer of hemp and hemp-derived products across state lines for commercial and other purposes. (*See id.* at 13:25-26). Thus, cannabidiol ("CBD") would be legal if produced in a manner consistent with the Farm Bill. (*See id.* at 13:26-14:2).

To take advantage of the fledgling CBD market, Mr. Horsman and his business partners founded Integrated CBD ("ICBD"), a vertically integrated, institutional scale, and quality supplier of organic hemp-deprived CBD products and ingredients. (*See id.* at 14:12-13). Beginning in January 2019, Mr. Horsman and his business partners began raising capital for their new venture from prospective investors. (*See id.* at 14:23-15:23; Compl. at 14:13-16:12). Among the first investors in ICBD was Plaintiff Lev, who personally contributed $50,000.00. (*See* **Ex. 1** at 15:20-23).

As soon as in April 2019, ICBD entered into two farm leases in Hyder Valley, Yuma County, Arizona. (*See id.* at 16:9-20; Compl. at 18:12-19:11). ICBD's ability to execute its business plan on a short timeline was a direct result of its relationship with various affiliated entities, namely, Integrated Ag LP, as ICBD made it clear to prospective investors. (*See* **Ex. 1** at 18:3-5). ICBD had access to Integrated Ag's assets, infrastructure, credit history, balance sheet, and farmland management expertise. (*See id.* at 18:5-6). Moreover, ICBD took advantage of Integrated Ag's affiliates' equipment rental business to obtain specialized equipment that it could not obtain directly. (*See id.* at 18:22-23; Compl. at 18:7).

Mr. Horsman and his business partners continued raising capital throughout 2019. (*See* **Ex. 1** at 20:6-18; Compl. at 16:13-18:1). Among the investors in the later rounds of capital raising was Plaintiff Jefferson, who invested $2,500,000.00 in a convertible note through his entity BRJ Holdings III, LLC in May 2019. (*See* **Ex. 1** at 21:1-3). Then, in August 2019, ICBD executed a Loan Agreement for a $30,000,000.00 debt facility from CEOF Holdings L.P. and Corbin Private Credit Opportunity Fund II, L.P. (together, "Corbin Capital). (*See id.* at 21:17-20). At this time, Corbin Capital became the senior secured creditor, while Plaintiff Jefferson and the other convertible note holders became subordinate lenders. (*See id.* at 21:22-22:1). Plaintiff Jefferson, through counsel, negotiated an Intercreditor Agreement with Corbin Capital, which resulted in Plaintiff Jefferson not being able to enforce his rights as a creditor until Corbin Capital's obligation had been paid in full. (*See id.* at 22:7-18).

In late 2019, the CBD market precipitously declined when the Food and Drug Administration announced that it could not conclude that CBD was generally recognized as safe (GRAS) for use in human or animal food and ruled that companies could not add CBD to food or beverages without violating the federal Food Drug & Cosmetic Act. (*See id.* at 23:6-13). On or around January 10, 2020, ICBD held a call with Plaintiff Jefferson and other investors, informing them of the state of the company and that its future viability was contingent on raising additional capital. (*See id.* at 25:19-21; Compl. at 28:20-22). During the forthcoming months, Mr. Horsman and Plaintiff Jefferson frequently interacted about the state of ICBD, with Plaintiff Jefferson explicitly demanding a return of his investment, threatening Mr. Horsman, and becoming more hostile as the months progressed. (*See* **Ex. 1**

at 26:4-28:8). Shortly thereafter, Plaintiff Lev began requesting confidential and sensitive financial documents from the entities affiliated with ICBD's founders, and Plaintiff Jefferson immediately followed suit. (*See id.* at 31:7-32:3).

On October 2, 2020, Plaintiffs Jefferson and Lev (and other investors) filed their complaint in this Court. *Inter alia*, the complaint states that Mr. Horsman induced their investments through fraudulent conduct. (*See* Compl. at 32:22-33:4). In particular, Plaintiffs allege that Mr. Horsman made materially false statements to Plaintiffs and the public, including through publications, press releases, investment presentations, pitch decks and other materials, and emails and verbal communications over the telephone and in-person, concerning ICBD's financial performance and business prospects, and failed to tell Plaintiffs of improper transactions and of the Company's dire financial status and business prospects. (*See id.* at 32:1-7). Additionally, Plaintiffs allege that Mr. Horsman fraudulently obtained a PPP loan and used ICBD funds to purchase a private plane. (*See id.* at 29:14-31:21). Plaintiffs also brought claims against Mr. Horsman's business partners and ICBD's affiliated entities on various theories, including conspiracy, aiding and abetting, conversion, and unjust enrichment. (*See id.* at 34:1-40:19).

Four days after the complaint in CV2020-012256 was filed, the Miami Herald published a story about the case. (*See* **Ex. 1** at 36:8-9). The story included a link to the complaint, which was not stamped by the Court, proving that Plaintiff Jefferson followed through with his threats to "expose" Mr. Horsman. (*See id.* at 36:8-13). Because of the publication of Plaintiffs' complaint, Mr. Horsman was removed from several business relationships and is currently responding to an inquiry by FINRA. (*See id.* at 37:24-39:2).

As a result of Plaintiffs' conduct, Mr. Horsman brought suit on theories of civil RICO, aiding and abetting, conspiracy, defamation, intentional interference with business relationships, false light invasion of privacy, and intentional infliction of emotional distress against Plaintiffs Jefferson and Lev. (*See id.* at 39:18-47:3). This litigation is docketed under the CV2021-006034 case number.

## III.   LEGAL ARGUMENT.

### A.   Legal Standard.

Ariz. R. Civ. P. 42(a) provides:

If actions before the court involve a common question of law or fact, the court may:

> (1) Join for hearing or trial any or all matters at issue in the actions;
> (2) consolidate the actions; or
> (3) issue any order orders to avoid unnecessary cost or delay.

This Rule make it plainly obvious that consolidation is strictly within the discretion of the Court. *Cf. Cypress on Sunland Ass'n v. Orlandi*, 227 Ariz. 288, 295 (App. 2011) (appellate courts review decisions on consolidation for abuse of discretion). Consolidation "does not merge the suits into a single cause, or change the rights of the parties." *Yavapai v. Cnty. v. Superior Court In and For Yavapai Cnty.*, 13 Ariz. App. 368, 370 (1970) (internal citations and quotations omitted). Instead, consolidation is done "for limited purposes or for the trial of certain issues only." *Torosian v. Paulos*, 82 Ariz. 304, 315 (1957). By consolidating, courts are permitted to group together common questions or fact or law, ensuring that legal questions impacting multiple cases are resolved consistently. *See Behrens v. O'Melia*, 206 Ariz. 309, 310-11 (App. 2001); *Hancock v. McCarroll*, 188 Ariz. 492, 495 (App. 1996) (upholding consolidation on the grounds that there was "sufficient commonality

of the questions of law.")

Moreover, pursuant to Local Rule 3.1(c)(1), a motion to transfer related cases may be brought by a party who believes that such cases are intertwined:

> Whenever two (2) or more cases are pending before different judges and any party believes that such cases: (A) arise from substantially the same transaction or event; (B) involve substantially the same parties or property; (C) call for determination of substantially the same questions of law; (D) or for any other reason that would entail substantial duplication of labor if heard by different judges.

**B.    This Case Should be Consolidated with CV2021-012256.**

There is little doubt that this case and the CV2021-006034 litigation should be consolidated. The crux of Plaintiff's contentions in this matter is that Defendants, particularly Mr. Horsman, fraudulently induced their investments for ICBD. And it was through this fraudulent conduct, according to Plaintiffs, that their investments were lost. Thus, Plaintiffs will have the burden of proving, by clear and convincing evidence, that Mr. Horsman and his business partners fraudulently obtained their investments in ICBD.

The performance of ICBD and whether or not Plaintiffs Jefferson and Lev defamed Mr. Horsman is also the basis of the CV2021-006034 litigation. Mr. Horsman alleges that, through leaking the lawsuit in this litigation to the media, he was, among other theories, defamed. Therein lies the common facts and issues: the performance of ICBD and Mr. Horsman's role in ICBD's failure. If Mr. Horsman can prove that it was demonstrably false that he committed any of the torts outlined in this case, he could make his claim for defamation. Consequently, this Court, in its discretion, should consolidate this matter with the CV2021-006034 litigation.

**C.    This Court Should Maintain Jurisdiction Over Both Matters.**

Local Rule 3.1(c)(3) states that "a motion to consolidate pursuant to Rule 42, Arizona Rules of Civil Procedure, shall contain the captions of all the cases sought to be consolidated, be filed in each case, and be heard by the judge assigned in the earliest-filed case. The case numbers of all the cases sought to be consolidated shall appear on the first page of the motion."  Because this case was the earliest filed case, it is proper for this Court, and Judge Martin, to hear this Motion.

Further, Local Rules 3.1(c)(3) outlines the factors courts examine in order to determine which Court retains jurisdiction after consolidation:

> In determining to which judge the case or cases will be assigned pursuant to (1) or (2) above, the following factors may be considered: (A) whether substantive matters have been considered in a case; (B) which judge has the most familiarity with the issues involves in the cases; (C) whether a case is reasonably viewed as the lead or principal case; or (D) any other factor serving the interest of judicial economy.

This Court, and by extension Judge Martin, has much more familiarity with the facts and issues in question than Judge Mikitish, who has been assigned the CV2021-006034 litigation. To date, Judge Martin has held a scheduling conference, reviewed the pleadings and proposed orders form the parties, and entered a Protective Order for confidential documents. Moreover, this case can be viewed as the "lead or principal case." Again, it bears worth repeating, if Mr. Horsman can prove the allegations set forth in this litigation are false, he has a *prima facie* case for defamation and his related claims. The CV2021-006034 case naturally flows from this litigation. Accordingly, this Court, and Judge Martin, should consolidate the two cases.

### III.    CONCLUSION.

For the foregoing reasons, this matter and CV2021-006034 should be consolidated, with this Court retaining jurisdiction.

RESPECTFULLY SUBMITTED this 7th day of May, 2021**.**

                                              **FREDENBERG BEAMS**

                              By:    /s/ Christopher S. Skinner
                                        Daniel E. Fredenberg
                                        Christopher S. Skinner
                                        *Attorneys for Defendants Patrick B. Horsman, Jeffrey M. Dreyer, Ari M. Schiff, Integrated AG XI, LLC, Integrated AG XI AZ LLC, Integrated AG XII, LLC, Integrated AG Holdings LLC, Integrated AG Holdings AZ LLC, Integrated AG LP, Integrated AG Equipment LLC, IAG Equipment LLC, Integrated AG Management LLC, Integrated AG Operations LLC, Verified Organic LP, Verified Organic LLC, and AZ Farm Management LLC*

COPIES of the forgoing sent by email this 7th day of May, 2021 to the following:

Ryan J. Andrews
David A. Weisz
**Andrews Law Firm**
822 North Monroe Street
Tallahassee, FL 32303
ryan@andrewslaw.com
david@andrewslaw.com

*And*

John "Jack" D. Wilenchik
**Wilenchik & Bartness**

2810 North Third Street
Phoenix, AZ  85004
JackW@wb-law.com
*Attorneys for Plaintiffs*

James O. Ehinger
Kevin R. Heaphy
**Ryley Carlock & Applewhite**
3200 North Central Avenue, Suite 1600
Phoenix, Arizona 85012
jehinger@rcalaw.com
kheaphy@rcalaw.com
*Attorneys for Defendants Goldcrest Farm*
*Trust REIT LLC and Hyder Ranch LLC*

 /s/ Christopher S. Skinner

# EXHIBIT 1

Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/14/2021 4:04:24 PM
Filing ID 12775123

**FREDENBERG BEAMS**
Daniel E. Fredenberg – 020158
Christian C. M. Beams – 019672
Christopher S. Skinner – 032781
4747 N. 7th Street, Suite 402
Phoenix, Arizona 85014
Telephone:  602/595-9299
Email: dfredenberg@fblegalgroup.com
Email: cbeams@fblegalgroup.com
Email: cskinner@fblegalgroup.com
*Attorneys for Patrick B. Horsman*

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| PATRICK B. HORSMAN, an individual, | Case No.  **CV2021-006034** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| BRETT R. JEFFERSON, an individual, and IAN LEV, an individual, | |
| Defendants. | |

Plaintiff Patrick B. Horsman, by and through undersigned counsel, for his Complaint against Defendant Brett R. Jefferson for Civil RICO, Civil Conspiracy, Intentional Interference with Business Expectancies, Defamation, False Light Invasion of Privacy, and Intentional Infliction of Emotional Distress and against Defendant Ian Lev for Civil Conspiracy, Aiding and Abetting Civil RICO, and Intentional Interference with Business Expectancies, alleges as follows:

## **INTRODUCTION**

1.      This case is about extortion, defamation, and business disparagement, whereby Defendants threatened Plaintiff that if Plaintiff did not pay them money, Defendants would,

among other things, falsely impugn Plaintiff's integrity, accuse him of unlawful conduct, disgrace Plaintiff publicly, and contact investors, government agencies, and the media to falsely tell them that Plaintiff misled investors and engaged in other unlawful acts. When Plaintiff did not succumb to Defendants' ultimatum, Defendants followed through on their threats. This action seeks redress for Defendants' reprehensible conduct.

2.    While Defendants may be trying to hide behind legal terms, their scheme is abundantly clear for what it is: an old-fashioned shakedown.

3.    Plaintiff Horsman co-founded Integrated Ag – a private equity fund that invests in farmland in the Southwestern United States – in 2012, and the company and its affiliates have been in continuous operations since then. Starting with just a couple hundred acres, over the course of the next eight years, Horsman and his partners acquired, managed, and controlled over 16,000 acres of farmland and created, both directly and indirectly through labor contractors, over 50 jobs in the state of Arizona.

4.    Like in many markets, reputation is critical in the investment industry. The Arizona agricultural industry in particular is an especially tight-knit community of buyers, sellers, investors, farmers, and interconnected service providers, making the favor and goodwill of market participants an invaluable part of Integrated Ag's business. Integrated Ag and its principals and affiliates have long enjoyed a good reputation within the industry.

5.    Plaintiff Horsman is an entrepreneur who, in addition to co-founding Integrated Ag, has founded several other successful businesses. The majority of Horsman's career has been focused on his own investment management business and raising capital for other fund managers as a placement agent. Over the course of his nearly 20-year-long career, he has

raised over $15 billion of institutional capital for hedge funds, private equity, and real estate managers. Horsman holds the Certified Financial Analyst designation and FINRA Series 7, 24, 66, and 79 licenses. Horsman's business reputation and advantageous business relationships with investors are critical components to his work with private investment funds.

6.      On December 11, 2018, Congress passed the Agriculture Improvement Act of 2018 (the "2018 Farm Bill") that legalized the cultivation of hemp, drastically transforming hemp policy in the United States by allowing the transfer of hemp and hemp-derived products across state lines for commercial and other purposes and easing restrictions on the sale, transport, or possession of hemp-derived products. This meant that cannabidiol (CBD), a non-intoxicating compound derived from hemp, would be legal if produced in a manner consistent with the Farm Bill.

7.      At that time, CBD exploded in popularity and was touted for its potential benefits in treating pain, providing relief for anxiety and depression, and promoting sleep, among others. To capitalize on the newly found demand for CBD and the lack of reliable industrial-scale supply, Horsman and his partners saw the opportunity to use their connections and expertise in the agricultural industry to launch Integrated CBD LLC ("Integrated CBD"), a vertically integrated, institutional scale and quality supplier of organic hemp-derived CBD products and ingredients.

8.      To execute their vision, in January 2019, Horsman and his partners prepared an investor presentation that outlined the opportunity in the newly legal hemp and CBD industry and explained how their background as founders and managers of Integrated Ag and

its affiliates, as well as their connections and expertise in investing in and managing farmland in Arizona and California, were advantageous in their new venture to grow and process hemp on an industrial scale. In addition to outlining the opportunity to invest in the first-of-its-kind hemp growing and processing operation, the presentation and accompanying subscription agreement also emphasized the risks of early-stage company investing and warned investors against relying on any forward-looking statements.

9.     Over the course of the next 14 months, Integrated CBD raised in excess of $60 million from institutional and accredited individual investors, including $1.3 million from Plaintiff Horsman and his family, $2.5 million from BRJ Holdings III, LLC[1], and $50,000 from Defendant Lev. Integrated CBD used the proceeds to hire a full-time team, lease farmland, purchase hemp seeds, plant and cultivate hemp, purchase and lease farming equipment, hire multiple contractors and engineering firms to design and build a hemp drying and processing facility and a separate extraction and distillation facility.

10.     Following the legalization of hemp cultivation, hemp acreage in the U.S. more than tripled from 2018 to 2019, leading to an oversupply at harvest in the fall of 2019.[2] In November 2019, the Food & Drug Administration ("FDA"), which had assumed regulatory authority over hemp-derived products after the passing of the 2018 Farm Bill, prohibited putting CBD into food and beverages and issued numerous warning letters that certain CBD products violated the federal Food Drug & Cosmetic Act.

---

[1] Jefferson is the sole member of BRJ Holdings III, LLC, a Nevada limited liability company.
[2] Mona Zhang & Paul Demko, "Hemp was supposed to boost farmers.  It's turned out to be a flop," Politico (May 25, 2020), https://www.politico.com/news/2020/05/25/hemp-farmers-275046.

11.    While the FDA had previously issued a series of warning letters to the same effect since as early as spring 2019, neither Integrated CBD nor its investors, which included large institutions, foresaw that it would fundamentally impact Integrated CBD's ability to execute its business plan because food and beverage was one of the many potential end markets. The FDA's November 2019 announcement, however, was significantly more detrimental to the industry than the earlier letters, stating that the FDA could not conclude that CBD was generally recognized as safe (GRAS) for use in human or animal food.

12.    As a result, although farmers produced significant quantities of hemp and processors were processing it into high-quality CBD oil, large companies that had been planning to buy CBD ingredients for their consumer product launches did not follow through on those plans. This led to a severe supply-demand imbalance, causing hemp and CBD prices to plummet significantly below their cost of production. In 2020, for example, asset values in industrial hemp had diminished so much that several CBD businesses filed for Chapter 11 bankruptcy, including Kentucky's GenCanna Global, which had previously been planning an IPO.[3] As demonstrated in the following chart, the year-on-year price of CBD and hemp decreased significantly (-79%) from May 2019 to April 2020.[4]

---

[3] *Id.*; 'Precipitous' Decline in Hemp and Cannabis M&A Continuing Amid COVID-19 Pandemic, Forbes (Apr. 17, 2020), https://www.forbes.com/sites/mergermarket/2020/04/27/precipitous-decline-in-hemp-and-cannabis-ma-continuing-amid-covid-19-pandemic/?sh=3e4f32665c05.

[4] New Leaf Data Services, LLC; *see also* "America is Growing 8x the Amount of CBD Hemp it Can Consume and Prices Are Crashing," Kush.com, kush.com/blog/america-facing-hemp-cbd-surplus/ (last visited Nov. 29, 2020) (explaining the sequence that led to the hemp price crash).



13.    As a result of such macroeconomic conditions, Integrated CBD, like its industry peers, was unable to generate its projected revenue. The cannabis industry also generally saw a sharp decline in investment activity as a result of weak industry performance in 2019, halting investment activity in the hemp industry and further exacerbating the situation.

14.    Despite meeting (and exceeding) its fundraising benchmarks and milestones through the early fall of 2019, in early December, it became apparent that the future of Integrated CBD was in jeopardy. At that time, Horsman did all he could to support the business, and even personally injected an additional $571,000 into the company in early 2020 to support its ongoing operation. Unfortunately, as the industry continued to decline, Integrated CBD and its investors – including Horsman and his partners – ultimately lost the entirety of their investments.

15.     Rather than accept that outcome, Defendants pressured Horsman to return their entire investments, even if doing so would be at the expense of other investors. On August 10, 2020, Ryan Andrews, counsel acting on behalf of Defendants and BRJ Holdings, sent a letter to Horsman's counsel demanding that Horsman return **all** of his clients' investments, despite acknowledging that they would obtain a "much smaller judgment" in court. In the same letter, Mr. Andrews used the threat of a FINRA investigation to pressure Horsman into settling, noting that if Horsman refused to agree to their unreasonable terms, "a blacklist from fundraising will be received as a victory." Mr. Andrews also threatened that "if [his] client prevails on a breach of fiduciary duty claim against [Horsman], [Horsman] will be out of the raising capital business forever," despite the fact that BRJ Holdings, in its capacity as a lender, as opposed to an investor, could not and did not pursue such a claim.

16.     In a text message exchange the next day, on August 11, 2020, Horsman suggested to Jefferson that they attempt to resolve the matter out of court and on reasonable terms, but Jefferson was unreceptive. The following week, on August 19, 2020, Jefferson emailed Horsman and threatened to use the press to seek repayment of the entirety of his investment:

> I will [sic] contacting CNBC to sell you "Patrick the scam artist" to American Greed so they can also alert everyone.  Please note that I will also be contacting major media contacts I have to make sure that [sic] know about your antics…  Patrick Fuck You we are going to war!!

17.     Jefferson continued to demand that Horsman pay him money if Horsman did not want to be publicly disgraced. When those threats did not lead to the desired outcome, Defendants followed through on their threats to spread false information and publicly accused Horsman of unlawful conduct and disgrace. BRJ Holdings III, LLC and Lev filed a

7

groundless and frivolous action in Maricopa County Superior Court on October 2, 2020 ("The Frivolous BRJ Complaint")  Notably, Jefferson's extortionate threats and defamatory statements were made by him personally, yet he was not a party to the Frivolous BRJ Complaint. As a result, Jefferson's defamatory statements about, and extortionate threats against Horsman are not protected by the litigation privilege for defamatory statement made in litigation. True to Defendants' threats, the Frivolous BRJ Complaint  is rife  with  false, tabloid style accusations against Horsman and his business partners and businesses. And, Jefferson and Lev knew they were false when they made them. Defendants falsely accused Horsman of fraudulent conduct because they knew that doing so would destroy Horsman's reputation and ruin his career – and that is exactly what Defendants set out to accomplish when Horsman refused to succumb to their shakedown.

18.    Four days after the complaint was filed on October 2, 2020, the Miami Herald published a story about the case. The story included a link to a copy of the complaint that was *not stamped by the court*, meaning that Defendants followed through with their threat to use the press and alerted the media regarding the details of the civil action. The story also included information regarding some of Horsman's real estate holdings that were not even discussed in the publicly filed complaint.

19.    Even after the filing of the complaint, Jefferson's threats to Horsman did not cease. In January 2021, Jefferson threatened Horsman that if Horsman did not pay him and Lev the full amount of their investment, they would cause additional plaintiffs to join the lawsuit against Horsman, which would in turn increase Horsman's costs of defending against the lawsuit. Conversely, if Horsman paid Jefferson and Lev off now, then "we will disappear"

and "others will not have the commitment or staying power to continue." Jefferson's assertion that he could direct others to pursue or forgo legal action against Horsman as it suited his interests confirms that Jefferson's sole concern is getting paid off – not rectifying any alleged (and nonexistent) wrongdoing.

20.    In sum, Defendants are abusing the legal process as a tactic in their attempt to extort money from Horsman as a result of a failed investment in an industry that experienced severe turmoil over the past year.

21.    Defendants' actions have damaged Plaintiff by, among other things, forcing Plaintiff to expend hundreds of thousands of dollars to mitigate the harm caused by these malicious acts, including harm to business reputation, advantageous business relations with investors, loss of millions of dollars-worth of business profits, loss of goodwill, and emotional distress. Plaintiff has been forced to retain the undersigned counsel and required to pay their reasonable attorneys' fees and costs.

## **PARTIES**

22.    Plaintiff Patrick Horsman is a resident of San Juan, Puerto Rico. Horsman is an entrepreneur who grew up in Scottsdale, Arizona, and has founded several businesses in the area, including Integrated Ag LP and Integrated CBD. At all relevant times, Horsman was the President, CEO, and Chairman of the Board of Integrated CBD, which was headquartered and did business in Maricopa County, Arizona.

23.    Defendant Ian Lev is a resident of Maricopa County, Arizona. Lev holds himself out as a cannabis entrepreneur and is the founder and CEO of Hy Yield Scientific, a producer of agricultural fertilizer. At one point, Lev was the CEO of Hydrotek Hydroponics,

a distributor of hydroponic equipment for cannabis growers. In January 2019, Lev invested $50,000.00 in Integrated CBD and signed the subscription agreement acknowledging the risks associated with his investment. In Spring 2020, after Integrated CBD's unfortunate downturn, Lev embarked on a calculated scheme to try and recover his capital investment. When Horsman and Horsman's business partners rebuffed his requests, Lev recruited a serial litigant Jefferson, who Lev knew was willing to go to extraordinary – and illicit – lengths to pressure Horsman to return their investments.

24.    Defendant Brett Jefferson is a resident of Fairfield County, Connecticut. In May 2019, Jefferson, through his entity BRJ Holdings III, LLC, loaned $2.5 million to Integrated CBD in the form of a convertible note. Jefferson is the founder and President of Hildene Capital Management, a Connecticut-based asset management firm that specializes in structured finance investments, and has been involved in the finance and investment sector for over 25 years. In addition to working in the finance and investment industry, Jefferson is a serial litigant, with a decades-long history of suing his business partners and associates. In the finance industry, Jefferson has a reputation as a difficult investor who often threatens meritless litigation to get his way. In October 2020, after Horsman did not succumb to Jefferson's and Lev's threats to publicly disgrace Horsman if he did not pay them money, Jefferson and Lev acted on their threats and publicly spread false information about Horsman and initiated a pending civil action against him, among others, in the Superior Court of Arizona, Maricopa County.  Because Jefferson is not a named party in CV2020-012256, he is not entitled to the absolute litigation privilege recognized under Arizona law.

## **RELEVANT NONPARTIES**

25.    Integrated CBD LLC is a Delaware limited liability company that was headquartered and did business in Scottsdale, Arizona.

26.    Integrated CBD Holdings LLC is a Delaware limited liability company that was headquartered and did business in Scottsdale, Arizona.

27.    Integrated CBD LLC and Integrated CBD Holdings LLC are referred to interchangeably throughout this complaint as "Integrated CBD." At all relevant times, Horsman was the President, CEO, and Chairman of the Board of Integrated CBD. Lev invested $50,000.00 in Integrated CBD in January 2019; in May 2019, Jefferson, through BRJ Holdings III, LLC, loaned Integrated CBD $2.5 million via a convertible note.

28.    Integrated Ag LP is a Delaware limited liability company headquartered in Scottsdale, Arizona. Integrated Ag is a private equity fund that invests in farmland in the Southwestern United States. Horsman is Integrated Ag's co-founder and managing partner.

## **JURISDICTION AND VENUE**

29.    This is an action for damages that exceed $300,000.00, exclusive of attorneys' fees, costs, and interest.

30.    This Court has jurisdiction over Defendants to this action pursuant to U.S. Const. amend. XIV and Ariz. R. Civ. P. 4.2(a). Jurisdiction over Lev is proper because Lev is a resident of Maricopa County, Arizona. Jurisdiction over Jefferson is proper because he purposefully availed himself of the privilege of conducting business in the State of Arizona, such that the claims advanced, *infra*, arise out of his contact with businesses and individuals within the State of Arizona, and therefore the exercise of personal jurisdiction is reasonable.

11

*Inter alia*, Jefferson purposefully availed himself of the laws of the State of Arizona by (1) investing in Integrated CBD, ***a Maricopa County, Arizona-headquartered company***, whose performance was the subject of Jefferson's ire, resulting in the allegations contained herein; (2) committing tortious acts against Horsman resulting from Jefferson's outrage that his capital investment, loaned through BRJ Holdings III, LLC to Integrated CBD, ***a company headquartered in Maricopa County, Arizona***, was lost through unfortunate market changes; (3) personally, and not on behalf of BRJ Holdings, threatening to "expose" Horsman for Horsman's alleged illicit actions unless the entirety of his loan to Integrated CBD was returned, emanating from Horsman's actions as President and CEO of Integrated CBD, which, again, ***is headquartered in Maricopa County, Arizona***,  constituting Civil RICO under Arizona law; (4) taking the yet-filed complaint in CV2020-012256, ***eventually filed in Maricopa County, Arizona***, and leaking it to numerous media outlets, including, but not limited to, the Miami Herald; and (5) conspiring with Co-Defendant Ian Lev, ***a resident of Maricopa County, Arizona***, to engage in a pattern of unlawful extortion to try and recoup their capital investments in Integrated CBD.

31.     This Court has subject matter jurisdiction over this matter pursuant to Ariz. Const. Art. VI, §14 and A.R.S. §12-123.

32.     Venue is proper in Maricopa County, Arizona, pursuant to A.R.S. § 12-401(1) because Defendant Lev resides in Maricopa County, Arizona.

33.     This case is eligible for, and Plaintiff hereby requests, assignment of this case to the Commercial Court under Ariz. R. Civ. P. 8.1(a)(1)(B)-(C) because this action seeks

monetary relief in amount greater than $300,000.00 and the primary issues of law and fact concern a "business organization" and a "business contract or transaction."

## ALLEGATIONS
### Background

34.    Plaintiff Horsman co-founded Integrated Ag in 2012 with Jeff Dreyer, Ari Schiff, and Michael Timony. Having previously been involved in the private equity, real estate, and agricultural industries, they saw the opportunity to invest in underdeveloped farmland in Arizona and California. That land was particularly suitable for farming because, due to year-round warm temperatures, it enjoyed uninterrupted crop-growing cycles, unlike the land in the Midwest and Northeast, which remained idle during the winter months and was less productive. Integrated Ag focused on sustainable water-saving technologies, such as drip irrigation, to increase the value and marketability of the properties and generate profits for its institutional investors.

35.    Since its inception, Integrated Ag has been in continuous operation and grew from the four-person founding team and just a couple of hundred acres of leased land to over 40 employees and 16,000 acres, right before Defendants set out on their vindictive smear campaign. Over the course of its operation, Integrated Ag created over 50 jobs in the state of Arizona.

36.    On December 11, 2018, Congress passed the 2018 Farm Bill. The Bill drastically transformed hemp policy in the United States, legalizing the cultivation of hemp – also known as cannabis sativa L – and allowing transfer of hemp and hemp-derived products across state lines for commercial and other purposes. This meant that cannabidiol

(CBD), a non-intoxicating compound derived from hemp, would be legal if produced in a manner consistent with the Farm Bill.

37.    Around the same time, CBD exploded in popularity and was touted for its potential benefits in treating pain, providing relief for anxiety and depression, and promoting sleep, among others. Yet, there were no institutional-scale producers of CBD in the United States because, until that time, growing hemp was illegal under federal law.

38.    To capitalize on the newly legal industry and corresponding demand for CBD, Horsman and his business partners saw the opportunity to use their connections and expertise in the agricultural industry in Arizona – with its year-round growing conditions and predictable weather pattern – to found Integrated CBD, a vertically-integrated, institutional scale and quality supplier of organic hemp-derived CBD products and ingredients.

39.    In early January 2019, Horsman and his business partners began to crystallize their vision and prepared an investor presentation that outlined the opportunity – and accompanying risks – to potential investors. The presentation relied heavily on Integrated Ag's experience and connections in the farmland industry, including its leadership team and its access to over 10,000 acres of conventional and organic farmland in Arizona, to plant 2,000-3,000 acres of hemp in 2019.  At that time, Integrated CBD had not yet formally launched.

40.    The initial fundraising round was intended to raise capital to lease farmland, hire key executives and staff, including hemp cultivation experts, identify sources of high-quality seeds, and engage service providers to execute on a very fast ramp-up to planting

14

hemp in the spring of 2019. Once Integrated CBD launched, Integrated Ag's team of executives, farmers, and operations specialists would form the core team of Integrated CBD.

41.    Absent Integrated Ag's existing team, balance sheet, credit history, farmland development experience, and farmland ownership, Integrated CBD could not have possibly established and scaled its operations at the rate that it did. The relationship between Integrated Ag and Integrated CBD – as well as Integrated CBD's reliance on Integrated Ag to support its operations – was clearly outlined in the presentation that was shared with Integrated CBD's investors, including Defendants, and was the key advantage that Integrated CBD had over its competitors.

42.    In addition to outlining the opportunity to invest in the first-of-its-kind hemp growing and processing operation, the presentation and accompanying subscription documents emphasized – and all investors acknowledged – the risks of early-stage company investing, including that "the investment in the Company is speculative and involves a high degree of risk," the possibility of "the loss of Subscriber's entire investment," "decline in economic conditions," and "other general business risks, including the effects of a recession." It also warned investors against relying on any forward-looking statements.

43.    The idea, experience, and background of the founding team immediately resonated with investors, and Plaintiffs raised over $3.3 million of pre-seed capital, including $50,000 from Lev, in January 2019.

**Integrated CBD Meets and Exceeds Its Milestones**

44.    Immediately following the raise, Horsman aggressively pursued and exceeded many of the company's projected milestones to deliver value to its investors. In February

2019, McCarthy, a national construction company, submitted a proposal to build Integrated CBD's hemp extraction plant, intended to maximize production efficiency. In March 2019, Integrated CBD began designing the extraction facility with Jacobs Engineering, the number one industrial design firm in the United States. Around the same time, Integrated CBD sourced and ordered extraction equipment, identified a location for the hemp processing facility, began to design the drying, sorting, and packing facility, and purchased hemp seeds for planting.

45.    By April 2019, Integrated CBD entered into two farm leases for over 9,700 gross acres of farmland in Hyder Valley, Yuma County, which farmland had produced an above-average yield cotton crop the year before, in addition to being generally known for its consistent, favorable farming conditions. At all relevant times, through its relationship with Integrated Ag, which was highlighted in the investor presentations, Integrated CBD had access to: (1) over 15,000 gross acres, (2) over 14,000 farmable or tillable acres, and (3) over 10,000 farmable acres that were or could have been certified organic immediately and an additional 4,000 farmable acres that were conventional and could have been certified organic within three years.

46.    Between January and August 2019, Integrated CBD assembled an all-star team, including executives and employees who had previously worked at prominent public companies like JP Morgan, Google, Bloomberg, and Dupont, in addition to the core team of Integrated Ag's farming and development experts. The company also hired a General Counsel with previous public company experience, a Chief Revenue Officer to develop and execute a revenue strategy in 2019, a Chief Risk Officer to ensure the company was properly

managing risks across the business, and a plant scientist to head the hemp seed genetics program and develop proprietary seed genetics for planting in 2020.

47.    Integrated CBD was ready to plant its first crop in Yuma county in the late spring of 2019. It could not do so, however, until the State of Arizona passed its hemp legislation and the Arizona Department of Agriculture issued industrial hemp grower and industrial hemp processor licenses to the company. Arizona Governor Doug Ducey, with whom Integrated CBD executives met in early 2019 to discuss state hemp legislation, was a strong proponent of Arizona becoming a leading hemp producer. On February 20, 2019, Ducey signed Senate Bill 1003 allowing hemp farmers to begin planting crops, once properly licensed, in June 2019. In May 2019, Integrated CBD applied for the industrial hemp grower and processor licenses. It was among the first license recipients on June 5, 2019, and just two days later, it was the first license-holder to sow hemp seeds in Arizona on June 7, 2019, becoming "the largest hemp operation in the state," according to Brian McGrew, Industrial Hemp Program manager at the Arizona Department of Agriculture.

48.    The optimal crop planting window in Yuma County is in March, when temperatures are consistently in the 70s and 80s, which allows small plants to establish root systems prior to higher temperatures of Arizona summers. In light of the risks associated with planting later in the growing season (as a result of the legislative and licensing process) under more difficult conditions, Integrated CBD initiated multiple levels of risk management including, but not limited to, reducing the number of acres planted to minimize the impact of any crop losses, using both direct seeding and greenhouse seedlings, and installing above-

ground sprinklers to provide additional sources of water as the plant root systems were being established.

49.     Integrated CBD was able to accomplish as much as it did in such a short period of time in no small part due to its access to Integrated Ag's (and its affiliates' and team's) assets, infrastructure, credit history, balance sheet, and farmland management expertise. To launch quickly and be competitive with others in the industry, Integrated CBD leveraged its connections with Integrated Ag and its affiliates – the very connections it touted as the key to its success – to enter into arms-length, market-rate transactions for land, equipment, and services.

50.     For example, on March 15, 2019, Integrated CBD entered into a farm lease with Integrated Ag XI. Although the two entities are related by common management, Integrated Ag XI did not arbitrarily set the pricing and terms of the lease. Instead, the key lease terms mirrored the terms of another farmland lease on an adjacent property that Integrated CBD negotiated over the course of several months with an independent third party, Goldcrest Farm Trust REIT, LLC. The terms and pricing in both leases are consistent with those of the prior leases on the same property and a subsequent lease signed on the property to grow alfalfa after Integrated CBD defaulted on its lease obligations.

51.     Integrated CBD also took advantage of Integrated Ag's affiliates' existing equipment rental business to obtain below-market rates for specialized equipment. This equipment rental relationship was not unique to Integrated CBD, and Integrated Ag projects had historically relied on Integrated Ag affiliates for equipment because they could procure it at lower rates. The rates charged by affiliates for equipment were based on rates requested

from multiple third-party equipment rental companies. Certain equipment was not available for rent and had to be purchased. At that time, Integrated CBD had no revenue, balance sheet, or credit history, and therefore was unable to finance equipment purchases and did not have enough capital to buy the equipment outright. To allow Integrated CBD to obtain the necessary equipment, Integrated Ag stepped in and purchased it on its own balance sheet using its own credit history and then leased it to Integrated CBD. Integrated Ag did not make any profit on the equipment leased to Integrated CBD; in fact, Integrated Ag suffered losses on the equipment it purchased for Integrated CBD and is to this day making payments on specialized equipment it has been unable to sell.

52.    The farm management fees were likewise at or below industry averages. Farm management agreements are common in large-scale institutional farming operations. Institutional investors often hire farm managers to operate and farm their properties for them, and Integrated Ag had an existing farm management business that employed a team that provided services to several clients. Integrated CBD hired Integrated Ag's existing farm management team to manage its farming operations, and the farm management fees in 2019 equaled 5.6% of Integrated CBD's annual budgeted cost per acre, which is well within the industry range of 4.6%-6.5%. Further, Integrated CBD's 2019 farming budget covers only a ten-month period, and if the budget were annualized, Integrated CBD would have paid a fee of 4.7% of the budgeted farming cost per acre, which is at the low end of the industry range.

53.    If Integrated CBD did not use those farm management services, it would have been unable to meet the projected milestones and have a spring hemp crop in 2019. Within 60 days of the closing of the pre-seed round of funding, Integrated Ag's farming team began

preparing the soil for hemp by planting cover crops such as sunn hemp.[5] Absent a spring

hemp crop, Integrated CBD would have had no possibility of revenue in 2019, putting the

company at a massive disadvantage compared to competitors who were producing a crop

that year.

54.    From its inception until early fall of 2019, Integrated CBD also met and

exceeded many of its projected fundraising milestones. In March 2019, Plaintiffs raised $10

million of seed round capital from institutional and accredited-investor individual investors.

Between April and October 2019, Integrated CBD raised and had commitments for over $50

million of additional capital and financing via a combination of secured debt ($30 million

credit facility), Series A Convertible Note ($9.249 million), Series A units ($7.265 million

raised and additional $4.2 million committed and documents signed). Integrated CBD also

obtained an Equipment Lease facility of $15 million (at 65% advance rate) and a second

Equipment Lease facility of $5.5 million (at 100% advance rate). The $4.2 million in

committed capital in the Series A came from a London-based hedge fund Hadron Capital

that had previously made significant investments in the cannabis industry. Even as Hadron

was unable to perform on the subscription documents it had executed due to fundraising

difficulties, its Chief Investment Officer Marco D'Attanasio saw exceptional potential in

Integrated CBD:

> [O]ur fundraise[ing] efforts have proven extremely disappointing so far… In
> current markets your company is frankly the only new one in which we
> would invest with confidence if we had the capital… We are big fans of yours
> and believe you will be ultimately successful.

---

[5] Sunn hemp, when used as a cover crop, can improve soil properties, reduce soil erosion,
conserve soil water, and recycle plant nutrients

55.     Jefferson, through his entity BRJ Holdings III, LLC, loaned $2.5 million to Integrated CBD via the Series A Convertible Promissory Note ("Convertible Note") round in May 2019. Jefferson, who manages his own family office investing in hedge funds, private equity funds, and private companies and manages $12.2 billion of capital at Hildene, is arguably one of the most sophisticated investors in the world and has deep expertise in credit and distressed debt investments – exactly the type of investment he made in Integrated CBD.

56.     As the largest – and most sophisticated – investor in the round, Jefferson led the negotiation of the terms of the investment for himself and other investors in the round. Over the course of several weeks, Jefferson and BRJ Holdings III, LLC, represented by the national law firm Pepper Hamilton LLP[6], carefully negotiated the terms of the Convertible Note agreement. As a Convertible Note holder, Jefferson became Integrated CBD's creditor, with an option to convert that debt into equity, and which debt would automatically convert into equity if certain terms of the Convertible Note were met.

57.     On August 29, 2019, Integrated CBD entered into a Loan Agreement for a $30 million debt facility from CEOF Holdings L.P. and Corbin Private Credit Opportunity Fund II, L.P. (collectively, "Corbin Capital"). Under the Loan Agreement, Corbin Capital agreed to provide up to $30 million of financing to Integrated CBD.

58.     When Corbin Capital signed the Loan Agreement, it became the company's largest and most senior creditor and obtained the first lien on all company collateral and assets. As a result, Integrated CBD now had two groups of creditors: senior lender Corbin

---

[6] In July 2020, Pepper Hamilton LLP and Troutman Sanders LLP merged.  The merged firm is now referred to as "Troutman Pepper."

21

Capital and subordinate lenders Convertible Note holders, including Jefferson. This necessitated the negotiation and execution of an inter-creditor agreement between Corbin Capital and Convertible Note holders. An inter-creditor agreement is an agreement between two or more creditors that stipulates in advance how their competing interests would be resolved and how they would work in tandem to realize their mutual collateral.

59.    Once again, as the lead Convertible Note holder, Jefferson negotiated the Intercreditor Agreement with Corbin Capital. The Intercreditor Agreement determined how the shared collateral would be divided and sold, and how any proceeds would be distributed among creditors in the event of default, among other things. Under the Intercreditor Agreement, Corbin Capital, as the senior lender, would have sole authority with respect to initiating any enforcement action or otherwise acting (or refraining to act) on the shared collateral or Integrated CBD in the event of default.

60.    Importantly, under the Intercreditor Agreement, Jefferson agreed to a "Standstill," which meant that he could not take action to enforce his rights as Integrated CBD's creditor until Corbin Capital's obligations had been paid in full. This is a common provision between senior and subordinate lenders, and Jefferson, as an experienced credit investor represented by sophisticated and experienced legal counsel, was well aware of how it affected his rights.

61.    Up until and through October 2019, Integrated CBD was on track to meet its projected milestone of becoming a public company in early 2020. To that end, Integrated CBD: (i) sourced and hired renowned national law firm Latham & Watkins to handle its Series B fund raise and IPO-related legal work; (ii) engaged an accounting and audit firm

Ernst & Young as its auditor; (iii) engaged an IPO readiness consultant Morgan Franklin; (iv) engaged an IPO financial printer Donnelly Financial; (v) met with NASDAQ and NYSE staff on several occasions; and (vi) reserved the ICBD ticker symbol.

### Late 2019 Demise of the Industrial Hemp and CBD Industry

62.    Despite their best efforts and continued perseverance, Integrated CBD – like all companies in the CBD industry – was hit by countervailing market and regulatory forces in late 2019. Namely, the FDA assumed regulatory authority over hemp-derived products and declared in numerous warning letters in November 2019 that certain CBD products violated the federal Food Drug & Cosmetic Act, essentially rendering them illegal. This put CBD in a regulatory limbo, whereby the FDA told companies that they could not add CBD to food or beverages until it devised a set of rules, and then failed to provide any guidance regarding those products in the marketplace. This regulatory action crushed the supply-demand balance for CBD and hemp and sent prices plummeting to pennies on the dollar, compared to their cost to produce.

63.    While the FDA had previously issued a series of warning letters to the same effect since as early as spring 2019, neither Integrated CBD nor its investors, which included large institutions, foresaw that it would fundamentally impact Integrated CBD's ability to execute its business plan because food and beverage was one of the many potential end markets. The FDA's November 2019 announcement, however, was significantly more detrimental to the industry than the earlier letters, stating that the FDA could not conclude that CBD was generally recognized as safe (GRAS) for use in human or animal food.

64.     As a result, although hemp acres planted quadrupled in 2019, the regulatory uncertainty has severely hampered the production of hemp and CBD from late 2019 through present day. Large companies that were developing CBD products, including Ben & Jerry's, Unilever, and Anheuser-Busch, were unable to follow through with their plans and launch CBD products. This led to a severe supply-demand imbalance and caused hemp and CBD prices to plummet significantly below their cost of production. Hampered by the FDA's regulatory intervention, the market conditions for hemp growers and CBD ingredient manufacturers continue to decline through present day and prices have fallen even further, as CBD brands enjoy the artificially low input costs and increased profits.

65.     The cannabis industry also generally saw a sharp decline in investment activity as a result of weak industry performance. Public cannabis companies' shares took a hit during the summer 2019, posting losses and selling less cannabis than expected. The entire sector dropped on average 50%, with some companies declining as much as 60% in value. As a result, the limited group of investors investing in the industry – family offices, Canadian retail investors, and hedge funds – suffered significant investment losses over the summer and stopped investing further capital into both private and public companies. Because traditional private equity and other traditional long-only funds were not yet investing in the hemp industry, the depth of available capital was not there to support the market at any price, further exacerbating the situation.

66.     Nevertheless, Integrated CBD pressed forward with its next round of financing, working with several investment banks alongside the lead investment bank BMO Capital Markets ("BMO") to raise its Series B round. In October 2019, BMO, in collaboration with

Integrated CBD, prepared an investor presentation to use in connection with the Series B funding round. The presentation was reviewed by Integrated CBD's outside counsel, Latham & Watkins; BMO's counsel Shearman & Sterling; and Integrated CBD's in-house counsel and executive team prior to being distributed beginning in early October 2019. The presentation fully disclosed the FDA's statements and warnings issued prior to the completion and distribution of the presentation.

67.    In January 2020, after a difficult few months on the road fundraising in what had become a capital desert for both cannabis and hemp companies, Horsman decided to lead by example to instill confidence in Integrated CBD's investors and invested an additional $571,000.00 of his personal capital into the company in two separate transactions in January and March 2020. [7] Unfortunately, this was not sufficient to overcome the overall decline of the CBD industry, and by February 2020, it became apparent that the company could no longer meet its projected benchmarks and milestones and was running out of cash.

**Jefferson Threatens to Destroy Plaintiff's Reputation Unless He Returns the Full Amount of Jefferson's Investment**

68.    On or around January 10, 2020, Integrated CBD held a call with Jefferson, during which Jefferson was informed of the current status of the company and the need for immediate funding. On January 14, 2020, Integrated CBD held a company-wide investor update call and informed all investors in attendance that the company was running low on cash and that it had been extremely difficult to raise capital, even with the help of nine investment banks working on the raise, due to industry-wide fundraising difficulties. On that

---

[7] Horsman and his family previously invested $747,000 in Integrated CBD in earlier rounds.

25

call, Horsman announced that he would personally invest additional capital into the company to lead the next round of funding in hopes of attracting other investors and giving the company time to work through its cash flow issues.

69.    Following that call, on January 27, 2020, Jefferson emailed Horsman to inform him that, instead of converting his and other Convertible Note holders' debt to equity, he wanted to remain a creditor and get paid when Integrated CBD sold its collateral (refined CBD oil and hemp biomass).

70.    At this point, Jefferson's communications to Horsman took on a hostile tone, and Jefferson demanded that Integrated CBD revise the terms of the Convertible Note to make them more favorable to Jefferson and threatened to publicly impugn Horsman's character and reputation if Horsman did not comply with his demands. Jefferson's demands included a "second lien" for his Convertible Note that would have been detrimental to other investors in the company and made it much more difficult to raise capital to keep the company running.

71.    In response, Horsman appealed to Jefferson's reason and business judgment and implored him to work collaboratively to salvage any chance that Integrated CBD may have had at that point to raise additional capital and restore the company's operations:

> We are 100% focused on raising capital[,] which is your only chance at a recovery. Fighting over legal issues isn't a good use of any of our time right now. I tried to negotiate with you in good faith to reach a resolution and I'm happy to continue to do so. We don't believe giving you a second lien is in the best interest of the company right now as it will complicate our ability to bring in new investors. We don't want to add any additional road blocks to getting funding.

Our lawyers and Corbins [sic] lawyers have advised that there is a standstill in place. Corbin is working with us constructively and we would welcome the same participation from you.

We have 3 large investors in process which are each interested in writing $10-15M checks each. We have $3.5M in near term commitments circled and have raised $620K in the last 10 days. Adding a lawsuit will scare away the capital that we have been working so hard to bring in.

Gencanna one of our large competitors filed for BK today. https://www.google.com/amp/s/www.wsj.com/amp/articles/cbd-producer-gencanna-files-for-bankruptcy-11581029308

Our current situation is not unique to our business the entire cannabis industry is in a full[-]blown liquidity crisis. We need your help to get through this.

72.     In response, Jefferson threatened to "expose" Horsman under the guise of exercising his fiduciary responsibility:

Patrick[,] as an investment professional[,] I am very proud of my success as an investor. However, that does not compare to my performance as a fiduciary. I treat my investors with candor and respect. I answer every request in a forthright manner and my integrity has never been in question. You have lied and misled me. Your schemes and the way you have disrespected me and the other INVESTORS in our group is intolerable. I am going to exercise my fiduciary responsibility to society and expose you.

73.     Explaining that he, too, was acting in the best interests of Integrated CBD's shareholders in refusing to revise the terms of Jefferson's loan, to the detriment of the shareholders, Horsman replied:

I have never lied to you nor to any other investor. I also hold my role as a fiduciary in the highest importance which is why I'm not willing to do things just for you and the other Series A convert holders that are not in the best interest of the company and all investors.

It's unfortunate that we have run out of money in the middle of an extensive CapEx project. I'm working as hard as I can to raise money to support the business and investing my own money to sustain it and give us all additional

runway. This is an industry wide phenomenon and not unique to our company. Your acquisitions [sic] are hurtful and untrue.

I know you are upset[,] and I empathize with that[,] but we need your support or at a minimum some time which will provide you and the other investors the best opportunity to get a recovery. I am operating in your best interest and the best interest of the company trying to raise the funding we need to continue.

74.    Jefferson continued to pressure Horsman to cave to his demands. Even after Horsman explained (above) why he could not revise the terms of Jefferson's loan at the expense of the company's shareholders, Jefferson continued asking for additional protections such as a second lien on Integrated CBD's assets. That demand came over eight months after Jefferson had already negotiated the terms of BRJ Holdings III, LLC's Convertible Note back in May 2019 and Integrated CBD had closed on subsequent funding, including from Corbin Capital.

75.    When Horsman did not give in to Jefferson's demands, to demonstrate that he fully intended to follow through on his threats to publicly impugn Horsman's character, on February 6, 2020, Jefferson e-mailed Corbin Capital's counsel, accusing both Horsman and Corbin Capital of running a Ponzi scheme and threatening make his accusations public and invite regulatory scrutiny:

We will not turn a blind eye to this PONZI SCHEME and unless we can get reassurance that all parties are proceeding in legal fashion then we will pursue getting a judgement [sic]. If your client disagrees then they can appear in court and discuss the merits of our claims and then they can explain to the regulators why they are assisting in this PONZI SCHEME.

76.    Surprised by Jefferson's baseless threats, Corbin Capital made inquiries about Jefferson's reputation in the investment industry, to determine whether anyone else has had a similar experience with Jefferson in the past. It turns out that this was a typical pattern of

behavior for Jefferson, who commonly threatens meritless legal action to get his way and is a serial litigant, with a decades-long history of suing his business partners and associates.

77.    Despite Jefferson's incendiary e-mails to Horsman and Integrated CBD's investors, Horsman continued to appeal to Jefferson's professionalism. Horsman also reminded Jefferson of the terms of his Intercreditor Agreement with Corbin Capital, under which Integrated CBD could not satisfy any obligations to Convertible Note holders until it fully repaid its obligations to Corbin Capital:

> Brett, I like you[,] I respect you and I look up to you. The way you have been treating me with unfounded and untrue personal attacks over the last few weeks is unacceptable and if that's how you want to act[,] I don't want to engage. There is a standstill in place via the intercreditor so we can just sit here and do nothing and try to work on more important things like raising capital, selling product and generating revenue.

> I'm a reasonable, logical and professional business person [sic] and you can ask anyone who knows me including Corbin how I have been acting in the best interest of all investors through this situation in a highly cooperative manner including putting up $500K of my own capital when no one else was willing to put a dollar into the business.

> If you want to be constructive and try to help work out a solution[,] we would be happy to do so. If you want to attack us and make threats[,] I just don't think that's a good use of my teams [sic] time.

78.    Instead of engaging in a constructive discussion, Jefferson again threatened to smear Horsman's reputation in the press, stating in an e-mail to Horsman that, "I wouldn't give a second thought to discussing someone who crossed me [with the Wall Street Journal] . . . So it is very simple let's think of a way to break up and let's make sure that we all know how it is going to work."

79.    On February 24, 2020, Integrated CBD's executive team held a phone call with Convertible Note holders, including Jefferson. On the call, Horsman once again explained to

Jefferson the gravity of Integrated CBD's financial condition and that Corbin Capital was going to foreclose on its assets. Horsman further explained that the only way to recover value for investors would be to raise the next round of capital to keep the company alive. Jefferson understood that if Corbin Capital – the senior creditor to his Convertible Note – foreclosed on the company's assets, Jefferson would have no recovery. To mitigate the situation, Jefferson offered to help Horsman look for investors and make introductions. Although Jefferson never followed through on his offer of help, his threats temporarily ceased.

80.     On March 2, 2020, the company's senior creditor Corbin Capital notified Integrated CBD of its intent to foreclose on the company's remaining assets. Corbin had previously demanded that Integrated CBD install a Chief Restructuring Officer to oversee the restructuring process, and the company installed one on February 21, 2020. The company also received notices of default from its landlords on both the farmland leases and the building lease for its hemp processing facility.

81.     Several months later, on April 11, 2020, Defendant Lev reached out to Horsman asking for an update on Integrated CBD. Horsman complied and had multiple conversation with Lev, updating him on the business and providing him requested financial information, bank statements, and credit card statements. Unhappy that his investment did not work out the way he wanted to – despite acknowledging the risks of early-stage company investing, including complete loss of investment, in the subscription agreement – Defendant Lev decided that, instead of accepting the economic reality of the loss of his investment, he would demand his money back. On May 14, 2020, Lev reached out to Horsman and made extensive requests for additional sensitive financial information unrelated to Integrated CBD

(e.g., payroll records, bank statements, all employment and lease contracts, all vendor invoices) from several Integrated Ag affiliates and Horsman's personal holding entity. Acknowledging that he made that request solely to harass Integrated CBD's team and coerce Horsman to pay him off, Lev stated that if Horsman were to "send back my 50k instead of going through this exercise I'd gladly accept…."

82.    On May 27, 2020, Integrated CBD's executive team met with Lev and several others. During that meeting, Lev continued to request extensive financial information from Integrated CBD as well as several other entities. Integrated CBD's team explained to Lev that, because he was not a shareholder or principal in those other entities, he was not entitled to those entities' confidential and sensitive information, but they were willing to share it with Lev if he signed a non-disclosure agreement. Lev declined to do so, yet he persisted in making his unsubstantiated requests and again told Horsman that he would continue doing so – and waste Integrated CBD's team's time – unless Horsman paid him $50,000.

83.    It was at this point that Lev turned to Jefferson to embark on a concerted plot to force a refund of their investments in Integrated CBD. On information and belief, Lev and Jefferson entered into an agreement whereby Jefferson would threaten (and eventually follow through on his threat) to expose Horsman's allegedly illicit behavior to strong-arm him into succumbing to their threats. This extortive behavior was unsuccessful.

84.    With Lev's aid and encouragement, in June 2020, Jefferson resumed his threats. The focus of Jefferson's demands shifted, however, and began to echo those of Lev just several weeks earlier. Peculiarly, Jefferson's requests for information outlined in his June 25, 2020 e-mail to Horsman repeated verbatim Lev's requests from May 14, 2020. Now,

instead of demanding to revise the terms of his Convertible Note, Jefferson began asking for financial information relating to Integrated Ag's affiliates and Integrated CBD and demanded a return of the entire amount of his loan to Integrated CBD.

85.    Defendants' unrelenting threats escalated on August 10, 2020, when Ryan Andrews, counsel acting on behalf of Jefferson and Lev, sent a letter to Horsman's counsel demanding that Horsman return ***all*** of their investments, despite acknowledging that his clients would obtain a "much smaller judgment" in court. In the same letter, Mr. Andrews, used the threat of initiating a baseless FINRA investigation to pressure Horsman into settling, noting that if Horsman refused to agree to their unreasonable terms, "a blacklist from fundraising will be received as a victory." Mr. Andrews also threatened that "if [his] client prevails on a breach of fiduciary duty claim against [Horsman], [Horsman] will be out of the raising capital business forever," despite the fact that BRJ Holdings, in its capacity as a lender, as opposed to an investor, could not and did not pursue such a claim.

86.    Jefferson followed Mr. Andrews's letter with a menacing email on August 11, 2020:

> Corbin are a bunch of scumbags who can't come up with an original idea on their own. I am not sure of what you and [they] have going… ***The question for you is what happens to you.***

(Emphasis added.)

87.    In a text message the same day, on August 11, 2020, Horsman suggested to Jefferson that they attempt to resolve the matter out of court and on reasonable terms, but Jefferson was unreceptive. The following week, on August 19, 2020, Jefferson emailed Horsman and threatened to use the press to seek repayment of the entirety of his investment:

I will [sic] contacting CNBC to sell you "Patrick the scam artist" to American Greed so they can also alert everyone.  Please note that I will also be contacting major media contacts I have to make sure that [sic] know about your antics… *it won't be hard to get you put away*… Patrick Fuck You we are going to war!!

(Emphasis added.)

88.    Finally, in another e-mail to Horsman, Jefferson reiterated that if Horsman did not give him what he wanted – a complete return of his company's investment – Jefferson would do so much damage to Horsman's professional reputation by accusing him of fraudulent conduct that Horsman "will need to find a new line of work."

89.    Not once did Jefferson explain which conduct he considered fraudulent or on which alleged misrepresentations he relied on when he became the company's creditor. Instead, he dangled the threat of a lawsuit alleging fraud – which he knew would ruin Horsman's reputation in the investment industry and destroy his career – to extort $2.5 million from Horsman, who Jefferson acknowledged was "a wealthy man [who has] done well" in the investment management business.[8] Jefferson even admitted on a phone call to Horsman on July 17, 2020, that, while he could not point to any specific fraudulent acts, he would come up with something to make good on his threats.

90.    When those threats failed to lead to the result they wanted, Defendant Jefferson followed through on his threats to spread false information and publicly accused Horsman of unlawful conduct and disgrace.  BRJ Holdings III, LLC filed a groundless and frivolous action in Maricopa County Superior Court on October 2, 2020 ("The Frivolous BRJ

---

[8] Investment managers, like Horsman, owe fiduciary duties to their clients, and the industry is extremely sensitive to any wrongdoing; even mere accusations of fraud are fatal to careers and businesses.

33

Complaint")  Thereafter, Jefferson, acting in his personal capacity and not as  a party to the Frivolous BRJ Complaint  (and therefore not entitled to immunity for defamatory allegations made in litigation) personally published the same false  allegations in the Frivolous BRJ Complaint to Horsman's existing and prospective business associates, clients, acquaintances, and friends. Defendant Lev also published the fictitious allegations in the Frivolous BRJ Complaint to other members of his golf club, where he and Horsman are both members, along with many others in the local investment and agricultural industries. All of the  material allegations in the Frivolous BRJ Complaint are false.

91.    For example, the Frivolous BRJ Complaint falsely alleges that Integrated CBD's Paycheck Protection Program ("PPP") loan funds were not paid to employees and creates a false innuendo that Horsman used the funds to purchase a private jet. Integrated CBD's PPP loan funds were not used ***period***. The company received PPP loan proceeds totaling approximately $218,089.00 on May 7, 2020, and the funds were garnished by a creditor. Integrated CBD challenged the garnishment in court, and the court ordered to release the funds on September 30, 2020. Integrated CBD repaid the entire PPP loan, plus interest, back to the federal government shortly thereafter on October 13, 2020.

92.    The Frivolous BRJ Complaint also makes a litany of incoherent, false allegations supposedly provided by an anonymous director of Integrated CBD's farming leadership team. That "director" is Dave Dickson, who was, in fact, Integrated CBD's crop consultant. After the Frivolous BRJ Complaint became public, Dickson reached out to a former Integrated CBD partner and let him know that the complaint overstated and mischaracterized what he had told Defendants' representatives. Defendants, therefore, were

fully aware that those allegations were not true when they made them, and they made them with the sole purpose of punishing Horsman for not succumbing to their threats and to ruin his reputation and career, depriving him of his ability to earn a living.

93.    Further, the Frivolous BRJ Complaint falsely alleges that Horsman misused Integrated CBD's funds for his personal purposes. The sole basis for that accusation is that one of Integrated CBD's corporate credit cards had been "personally guaranteed" by Horsman. The personal guarantee was a requirement imposed by the credit card issuer, American Express, whereby an officer of the company had to be personally responsible for the company's credit card transactions in the event the company did not pay the bill.

94.    The accusation that Horsman misused the company credit card was false, and Defendants knew that it was false when BRJ Holdings III, LLC filed the complaint and Jefferson personally published the defamatory statements in the Complaint to which he was not a party, because, in the months leading up to the filing, Defendants requested and reviewed Integrated CBD's credit card and banking statements. Defendants, having seen the credit card statements, knew that the purchases charged to Integrated CBD's corporate American Express card were made for Integrated CBD – not for Horsman personally.

95.    For example, the largest of the allegedly personal purchases were for fertilizer ($422,000.00), equipment fuel ($287,000.00), seedling germination ($188,000), welding ($310,000.00), steel ($50,000.00), concrete ($121,000.00), farm equipment ($209,000.00), lab equipment ($136,000.00), and lab testing services ($27,000.00). Less than 4% of the charges on the company credit card were for executive travel and meals, all of which were valid and appropriate expenses related to Integrated CBD's business. American Express also

provided a working capital loan program to Integrated CBD, under which Horsman was personally responsible if the company were unable to repay the loan. Nevertheless, even having reviewed the actual charges on the company credit card statements, Defendants made their false, inflammatory, and malicious accusations knowing full well that doing so would irreparably damage Horsman's reputation and career and intending that effect – all because Horsman did not succumb to their shakedown.

96.     Four days after the Frivolous BRJ Complaint was filed on October 2, 2020, the Miami Herald published a story about the case. The story included a link to a copy of the complaint that was ***not stamped by the court***, meaning that Jefferson followed through with his threat to use the press and alerted the media regarding the details of the not-yet-filed civil action. The story falsely suggested that Horsman misused PPP funds to purchase a private jet and included information regarding some of Horsman's real estate holdings that were not even discussed in the publicly-filed complaint.

97.     Curiously, throughout their attempts to extort Horsman, neither Jefferson nor Lev accused Horsman of most of the misconduct they now allege in the complaint, even though all of the alleged misconduct would have been known to both Jefferson and Lev all along.[9] This is because Defendants knew that Horsman had not done anything wrong. Only when their threats failed, unable to extort the return of their entire investment, did Defendants come up with new, fictitious accusations against Horsman solely to make good on their threats and destroy Horsman's reputation and ability to earn a living.

---

[9] Jefferson and Lev questioned – and Integrated CBD explained in detail both verbally and over email – the transactions with Integrated Ag's affiliates and large credit card payments for farm labor, equipment, fertilizer, et al. *See* ¶ 87, *infra.*

98.    As recently as January 5, 2021, Jefferson once again threatened Horsman that if Horsman did not pay him and Lev the full amount of their investment, they would cause additional plaintiffs to join the lawsuit against Horsman, which would in turn increase Horsman's costs of defending against the lawsuit. Conversely, if Horsman paid Jefferson and Lev off now, then "we will disappear" and "others will not have the commitment or staying power to continue." Jefferson's assertion that he can direct others to pursue or forgo legal action against Horsman as it suits his interests confirms that Jefferson's sole concern is getting paid off – not rectifying any alleged (and nonexistent) wrongdoing.

99.    In sum, Defendants are abusing the legal process as a tactic in their attempt to extort money from Horsman as a result of a failed investment in an industry that experienced severe financial turmoil over the past year. While Defendants may be trying to hide behind legal terms, their scheme is clear for what it is: an old-fashioned shakedown.

**Ruinous Aftermath of Defendants' Unlawful Acts**

100.    Defendants' relentless threats and extortion attempts took an extreme toll on Horsman's physical and mental health and wellbeing. Already under enormous stress from the sudden and disastrous market and regulatory developments in the hemp and CBD market that eventually led to the demise of his company, Horsman now had to live in constant fear that Defendants would humiliate him and smear his good name and reputation if he did not cave to their demands.

101.    Once Defendants followed through on their threats and publicly accused Horsman of fraudulent conduct, Horsman's entire professional life crumbled, and he became a pariah to his now-former business partners and associates, clients, and friends in the

investment industry. Within days of the filing of the complaint and as a result of Defendants' public smear campaign against him, Horsman was forced to resign from Blue Sand Securities and Merion Investment Management, where he had been a Partner and Founder since 2002 and 2009, respectively.

102.    Several other business partners and counterparties severed their relationships with Horsman's businesses and demanded that Horsman not be involved if the relationships were to continue. For example, Triangular Capital Partners LLC demanded to terminate its agreement with Esoteric Investments LP, where Horsman is a Chief Investment Officer, and demanded "recusal of Patrick Horsman from any direct or indirect involvement with Triangular in any capacity until matters related to the fraud claims have been . . . dismissed." Integrated Ag likewise experienced a significant fallout as a result of Defendants' malicious smear campaign, which completely froze Integrated Ag's deal flow and caused at least one joint venture, Amande Glen Farms LLC, to terminate its management agreement with Integrated Ag. And every day that Defendants are allowed to communicate their false and defamatory statements and besmirch Plaintiff, Plaintiff continues to incur further harm to his reputation and existing and prospective business expectancies.

103.    Plaintiff has also been denied credit to refinance personal mortgages due to "open issues" in connection with the lawsuit, which credit would have allowed him to save a considerable amount of interest over 15 years.

104.    Because Defendants made good on their threat and provided the false narrative and accusations directly to FINRA, FINRA initiated an inquiry into Horsman's conduct,

causing Horsman to spend over $600,000 (to date) to hire legal counsel to oversee the inquiry.

105.    Overnight, Horsman lost almost the entirety of his livelihood – all because he continued to act in the best interests of Integrated CBD's shareholders and stood up to Defendants' extortion demands.

106.    As a result of Defendants' actions, for the first time in his life, Horsman began to experience symptoms of severe emotional distress in the form of fear, shock, anger, worry, humiliation, anxiety, irritability, and insomnia, causing him to seek professional crisis counseling.

107.    The claims brought against Defendants arise out of their repeated threats to ruin Horsman's investment business and falsely accuse Horsman of unlawful conduct if Horsman did not compensate Defendants. Defendants' conduct was intentional, willful, and wanton and resulted in significant damages, including loss of millions of dollars-worth of business profits and loss of goodwill.

### FIRST CAUSE OF ACTION
**Civil RICO**
**(Against Defendant Jefferson)**

108.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

109.    Arizona RICO allows a private cause of action for racketeering.

110.    Pursuant to A.R.S. §13-2314.04(A), a person who sustains a reasonably foreseeable injury to his business or property by a pattern of racketeering activity may file an action in superior court for the recovery of up to treble damages and attorneys' fees.

111.    A.R.S. §13-2301 defines racketeering as any act that would be chargeable or indictable under the laws of Arizona, including acts committed for financial gain, including extortion.

112.    A.R.S. §13-1804 defines "extortion" as follows:

A.    A person commits theft by extortion by knowingly obtaining or seeking to obtain property or services by means of a threat to do in the future any of the following:
. . .

5.    Accuse anyone of a crime or bring criminal charges against anyone.

113.    As set out above, Defendant Jefferson repeatedly and continuously threatened Plaintiff that if Plaintiff did not pay Defendant Jefferson money, Defendant Jefferson would contact the public, media, and government authorities and falsely tell them that Plaintiff was misleading investors and engaging in other wrongful conduct. Specifically, Jefferson threatened that if he and Lev did not receive a refund of their investment, he would bring criminal charges against the Plaintiff:

Whether it is  . . . ripping off the US Government by defrauding them . . . I am concerned that as a shareholder of ICBD I have a duty to inform the government that there was no basis for the loan as the company was already closed up. . . after everything I have learned *it won't be hard to get you put away*.  Ryan [Andrews] has been speaking with some "whistleblowers" former employees, and to put it into plain English, you are fucked.

(Emphasis added.)

114.    Defendant Jefferson's threat to wrongfully accuse Plaintiff of unlawful conduct and to disgrace him unless he was paid money was malicious at the time of these communications, and Defendant Jefferson knew or should have known that any statement accusing Plaintiff of wrongdoing with regard to his investors would be false.

40

115.   Defendant Jefferson intended to extort money from Plaintiff by threatening to make said statements.

116.   As a result of Defendant Jefferson's threats and extortion demands, Plaintiff feared that Defendant Jefferson would publicly accuse him of unlawful conduct he did not commit.  Based upon Jefferson's commission of the predicate act of extortion, Plaintiff has been proximately damaged as a consequence of the false accusations of criminal conduct.

117.   When Plaintiff did not succumb to Defendant Jefferson's ultimatum, Defendant Jefferson followed through on his threats to wrongfully accuse Plaintiff of unlawful conduct, publicly disgrace Plaintiff, and ruin his reputation and career.

118.   As a result of Jefferson's extortion, Plaintiff has suffered property losses, both in the form of direct and consequential economic losses, as well as emotional distress.

119.   Plaintiff has been injured by Jefferson's acts of extortion, which were committed for financial gain during Jefferson's racketeering enterprise.

### SECOND CAUSE OF ACTION
**Aiding and Abetting Civil RICO**
**(Against Defendant Lev)**

120.   Plaintiff incorporates the allegations set forth in the preceding paragraphs.

121.   As set out above, Defendant Jefferson extorted money from Plaintiff by threatening to contact the public, media, and government agencies and falsely tell them that Plaintiff was misleading investors and engaging in other wrongful conduct, thereby publicly disgracing Plaintiff and ruining his reputation and ability to make a living.

122.   Defendant Lev knew about and actively participated in Jefferson's unlawful plan whereby Lev contacted Jefferson to devise a way to strong-arm Plaintiff into paying

them money, acted in tandem with Jefferson to exert additional pressure on Plaintiff and amplify Jefferson's threats, and Defendants had an arrangement that Lev would financially benefit from any payoff that Jefferson received as a result of his extortion demands.

123.    As a result of Defendant Jefferson's extortion threats, Plaintiff has been damaged, and Defendant Lev's conduct was a substantial factor in causing harm to Plaintiff.

### THIRD CAUSE OF ACTION
**Civil Conspiracy**
**(Against All Defendants)**

124.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

125.    As set out above, when Defendants realized that their capital investments were lost, they agreed to set out on a conspiracy of illicit conduct to ruin Plaintiff's life. As part of their conspiracy, Defendant Jefferson repeatedly and continuously threatened Plaintiff that if Plaintiff did not pay Defendant Jefferson money, Defendant Jefferson would contact the public, media, and government agencies and falsely tell them that Plaintiff was misleading investors and engaging in other wrongful conduct.

126.    Defendant Lev participated in the conspiracy by acting in tandem with Defendant Jefferson to exert additional pressure on Plaintiff and amplify Jefferson's threats.

127.    The conspiracy between the Defendants culminated in working to defame and impugn Plaintiff's reputation and business standing by falsely accusing Plaintiff of dishonest and fraudulent conduct, which caused Plaintiff's contractual relationships to be severed. Defendants knew that these accusations were false, and they made them to publicly shame and punish Plaintiff and cause the demise of Plaintiff's career and loss of his ability to make a living.

128.    As a result of Defendants' conspiracy, Plaintiff has been damaged.

**FOURTH CAUSE OF ACTION**
**Intentional Interference with Business Expectancies**
**(Against All Defendants)**

129.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

130.    As set out above, Plaintiff and his businesses had contractual relationships with others in the investment industry, namely, Blue Sand Securities LLC, Merion Investment Management LP, Genesis Global Trading, Inc., Esoteric Investments LP, Newgate Capital Holdings LLC, Amande Glen Farms LLC, EJF Capital LLC, and Triangular Capital Partners LLC, among many others.

131.    Defendants were aware of those contractual relationships and Plaintiff's business expectancy with the above-named entities, naming some of them in the Frivolous BRJ Complaint solely to interfere with those relationships because their identities were wholly irrelevant to the allegations. As outlined herein, Jefferson cannot hide behind the absolute litigation privilege because he is not a party to the Frivolous BRJ Complaint.

132.    Defendants intended to harm Plaintiff and his businesses by falsely accusing him of dishonest and fraudulent conduct and causing those contractual relationships to be severed.

133.    As a result of Defendants' conduct, Plaintiff and his businesses suffered actual and presumed damages in an amount that will be proven at trial.

134.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiff's business, and harmed his profits, thus inflicting an irreparable injury.

135.    Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

**FIFTH CAUSE OF ACTION**
**Defamation**
**(Against Defendant Jefferson)**

136.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

137.    As set out above, Defendant Jefferson has made false and defamatory statements about Plaintiff through the publication of the Frivolous BRJ Complaint to third parties as alleged in Paragraph 90 through 95.

138.    Defendant Jefferson's  false and defamatory statements about Plaintiff were unprivileged and published to third parties as Jefferson was not a party to the Frivolous BRJ Complaint, and therefore not entitled to immunity.

139.    Defendant Jefferson acted at least negligently.

140.    Plaintiff suffered actual and presumed damages in an amount in an amount that will be proven at trial.

141.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiff's business, and harmed his profits, thus inflicting an irreparable injury.

142.    Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

## SIXTH CAUSE OF ACTION
### False Light Invasion of Privacy
### (Against Defendant Jefferson)

143.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

144.    As set out above, Defendant Jefferson has made false statements about Plaintiff that would be highly offensive to a reasonable person in Plaintiff's position.

145.    Defendant Jefferson's' false statements about Plaintiff were unprivileged and published to the general public in a way that made those false statements a matter of public knowledge.

146.    Defendants acted at least negligently.

147.    Plaintiff suffered actual and presumed damages in an amount that will be proven at trial.

148.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiff's business, and harmed his profits, thus inflicting an irreparable injury. Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against Defendant Jefferson)

149.    Plaintiff incorporates the allegations set forth in the preceding paragraphs.

150.    As set out above, Defendant Jefferson repeatedly and continuously threatened Plaintiff that if Plaintiff did not pay Defendant Jefferson money, Defendant Jefferson would contact the public, media, and government authorities and falsely tell them that Plaintiff was

misleading investors and engaging in other wrongful conduct, thereby publicly disgracing Plaintiff and ruining his reputation and ability to make a living.

151.   Defendant Jefferson's threat to wrongfully accuse Plaintiff of unlawful conduct and to disgrace him unless he was paid money was extreme and outrageous, going beyond all possible bounds of decency.

152.   Defendant Jefferson intended to extort money from Plaintiff by threatening to make said statements, and Defendant Jefferson intended his conduct to cause Plaintiff emotional distress, or recklessly disregarded the certainty that Plaintiff would suffer such distress.

153.   As a result of Defendant Jefferson's threats and extortion demands, Plaintiff feared that Defendant Jefferson would publicly accuse him of unlawful conduct and disgrace.

154.   When Plaintiff did not succumb to Defendant Jefferson's ultimatum, Defendant Jefferson followed through on his threat to wrongfully accuse Plaintiff of dishonest and fraudulent conduct, publicly disgrace Plaintiff, and ruin his reputation and career.

155.   Defendant Jefferson knew that his accusations were false, and he made them to publicly shame and punish Plaintiff and cause the demise of Plaintiff's career and loss of his ability to earn a living.

156.   As a result of Defendant Jefferson's conduct, Plaintiff suffered severe emotional distress in the form of fear, shock, anger, worry, humiliation, anxiety, irritability, and insomnia.

157.    Because Defendant Jefferson has been guilty of oppression, fraud or malice, express or implied, Plaintiff, in addition to the compensatory damages, is entitled to punitive and exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.      For an award of actual and treble damages for a pattern of racketeering under A.R.S. §13-2314.04(A);

B.      For an award of attorneys' fees and costs under A.R.S. §13-2314.04(D);

C.      For an award of prejudgment interest on damages under A.R.S. §13-2314.04(D);

D.      An award of compensatory and punitive damages in an amount to be proved at trial;

E.      All costs and expenses to which Plaintiff is are entitled, including reasonable attorneys' fees as provided by A.R.S. §§ 12-341 and 12-341.01, and as otherwise permitted by law;

F.      Pre-judgment and post-judgment interest; and

G.      Such other and further relief the Court deems appropriate.

RESPECTFULLY SUBMITTED this 14th day of April, 2021.

**FREDENBERG BEAMS**


By:     /s/ Daniel E. Fredenberg
        Daniel E. Fredenberg
        Christian C.M. Beams
        Christopher S. Skinner
        *Attorneys for Patrick B. Horsman*

47